No. 26-2027

In the
# United States Court of Appeals
for the Third Circuit

AVENTIS, INC., AND SUBSIDIARIES,

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Defendant-Appellee*.

On Appeal from the United States Tax Court, No. 11832-20
Hon. Kathleen Kerrigan, *Judge of the United States Tax Court*

## AVENTIS'S OPENING BRIEF


Parker Rider-Longmaid
*Counsel of Record*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

Raza Rasheed
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Ave. of the Stars, Ste. 200N
Los Angeles, CA 90067

Shay Dvoretzky
Rajiv Madan
Christopher P. Bowers
Nathan P. Wacker
Kevin R. Stults
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Jeremy Patashnik
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Petitioner-Appellant Aventis, Inc., and Subsidiaries*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner-Appellant Aventis, Inc., and Subsidiaries (Aventis), discloses that the following parent corporations and publicly held companies own 10% or more of its stock: Aventis, Inc., is wholly owned by Sanofi Foreign Participations B.V., a Dutch company, which in turn is wholly owned by Sanofi S.A., a publicly held French company. The Subsidiaries are ultimately wholly owned by Sanofi S.A. No publicly held company owns 10% or more of Sanofi S.A.'s common stock.

# TABLE OF CONTENTS


Page

DISCLOSURE STATEMENT ....... i

TABLE OF AUTHORITIES ....... v

INTRODUCTION ....... 1

JURISDICTIONAL STATEMENT ....... 10

STATEMENT OF THE ISSUES ....... 11

STATEMENT OF RELATED CASES ....... 11

STATEMENT OF THE CASE ....... 11

A. Legal background on FASITs ....... 11

B. Factual background and procedural history ....... 14

STANDARD OF REVIEW ....... 21

SUMMARY OF ARGUMENT ....... 22

ARGUMENT ....... 28

I. Aventis was not the beneficial owner of the FASIT assets and cannot be taxed as if it were. ....... 28

A. The Tax Court's factual findings make clear that Aventis was not the beneficial owner of the FASIT assets. ....... 29

1. Ownership looks to economic reality and requires control of the property plus the right to its benefits and exposure to its burdens. ....... 29

2. Aventis didn't beneficially own the FASIT assets because it lacked control over them and had neither the right to benefit from them nor exposure to their burdens. ....... 31

**TABLE OF CONTENTS**
(continued)

**Page**

3. *Geftman* makes clear that Aventis wasn't the beneficial owner of the FASIT assets. ....33

B. The Tax Court's contrary conclusion is internally contradictory and meritless. ....34

1. The Tax Court's control analysis contradicts its findings and rests on legal error. ....34

2. The Tax Court's benefits and burdens analysis likewise contradicts its factual findings and rests on legal error. ....35

II. If Aventis was nonetheless the beneficial owner of the FASIT assets, then it should have been permitted to deduct its payments to SAAN as interest payments on a debt. ....38

A. A transaction creates debt when one party lends money and both parties intend for the recipient to pay the money back. ....39

B. The attempted FASIT created a debt from Aventis to SAAN, not a grant of equity to SAAN. ....42

1. The parties' undisputed subjective intentions at the time of the transactions were to create debt. ....42

2. The objective characteristics of SAAN's interest confirm that the parties intended it to be debt, not equity. ....44

3. Other indicia confirm that SAAN's interest was debt, not equity. ....46

C. The Tax Court's contrary conclusion misapplies this Court's caselaw and contradicts the record. ....48

**TABLE OF CONTENTS**
(continued)

**Page**

1. The parties' intent, how the transaction documents were labeled, and SAAN's voting rights do not support treating SAAN's interest as equity. ....................... 50

2. SAAN's interests as both a creditor and stockholder of Aventis do not support an equity finding. ..................... 53

3. The various factors related to SAAN's ability to obtain repayment and whether Aventis could have secured financing on similar terms from outside creditors do not support treating SAAN's interest as equity. ........................................................................ 54

4. The source of payments to SAAN does not support treating SAAN's interest as equity. ..................................... 58

5. The timing of SAAN's payment to Aventis does not support treating SAAN's interest as equity. ....................... 59

CONCLUSION ........................................................................................ 61

CERTIFICATE OF COMPLIANCE .................................................... 62

CERTIFICATE OF SERVICE ............................................................. 64

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Co. v. Commissioner*,
154 F.4th 574 (8th Cir. 2025) ........ 30

*Calumet Industries, Inc. & Subsidiaries v. Commissioner*,
95 T.C. 257 (1990) ........ 46

*Commissioner v. Banks*,
543 U.S. 426 (2005) ........ 29, 30

*Commissioner v. First Security Bank of Utah, N.A.*,
405 U.S. 394 (1972) ........ 29, 30

*Commissioner v. Glenshaw Glass Co.*,
348 U.S. 426 (1955) ........ 29

*Commissioner v. Indianapolis Power & Light Co.*,
493 U.S. 203 (1990) ........ 29

*Corliss v. Bowers*,
281 U.S. 376 (1930) ........ 29, 30, 35

*Fin Hay Realty Co. v. United States*,
398 F.2d 694 (3d Cir. 1968) ........ 7, 8, 9, 25,
........ 26, 27, 39, 40,
........ 41, 46, 47, 48, 49,
........ 51, 54, 55, 58, 59, 60

*Frank Lyon Co. v. United States*,
435 U.S. 561 (1978) ........ 22, 24, 29

*Geftman v. Commissioner*,
154 F.3d 61 (3d Cir. 1998) ........ 6, 9, 22,
........ 23, 26, 27,
........ 28, 29, 30, 33,
........ 34, 35, 39, 40, 50, 51

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021) ........ 21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*GWA, LLC v. Commissioner*,
T.C. Memo. 2025-34, 2025 WL 1126982
(T.C. Apr. 16, 2025)....................36

*In re Sentinel Management Group, Inc.*,
728 F.3d 660 (7th Cir. 2013)....................21

*Karns Prime & Fancy Food, Ltd. v. Commissioner*,
494 F.3d 404 (3d Cir. 2007)....................40

*Merck & Co., Inc. v. United States*,
652 F.3d 475 (3d Cir. 2011).................... 7, 9, 22,
.................... 26, 27, 40,
.................... 41, 42, 44, 45, 56

*NA General Partnership v. Commissioner*,
T.C. Memo. 2012-172, 2012 WL 2344719
(T.C. June 19, 2012)....................52

*PepsiCo Puerto Rico, Inc. v. Commissioner*,
T.C. Memo. 2012-269, 2012 WL 4207299
(T.C. Sept. 20, 2012)....................52

*Scriptomatic, Inc. v. United States*,
555 F.2d 364 (3d Cir. 1977).................... 40, 41, 46, 49

*U.S. Bank National Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*,
583 U.S. 387 (2018).................... 21, 22,
.................... 36, 49, 50

*Vento v. Director of Virgin Islands Bureau of Internal Revenue*,
715 F.3d 455 (3d Cir. 2013)....................21

**STATUTES AND RULE**

I.R.C. § 860H(a) (1997)....................3, 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

I.R.C. § 860H(c)(1) (1997) ........ 3, 4, 8, 26, 42, 50, 51

I.R.C. § 860L(a)(1)(B) (1997) ........ 12

I.R.C. § 860L(a)(1)(C) (1997) ........ 12

I.R.C. § 860L(a)(1)(D) (1997) ........ 12

I.R.C. § 860L(b)(1) (1997) ........ 12, 13

I.R.C. § 860L(b)(2) (1997) ........ 13

I.R.C. § 860L(c) (1997) ........ 12

I.R.C. § 6213(a) ........ 10

I.R.C. § 6214(a) ........ 10

I.R.C. § 7482(a) ........ 10

Small Business Job Protection Act of 1996,
Pub. L. No. 104-188, 110 Stat. 1755 ........ 3, 11, 12

American Jobs Creation Act of 2004,
Pub. L. No. 108-357, 118 Stat. 1418 ........ 14

Fed. R. App. P. 13(a)(1) ........ 10

**OTHER AUTHORITIES**

Kevin Dolan,
*Foreign Tax Credit Generator Regs: The Purple People Eater Returns,*
115 Tax Notes (TA) 1155 (June 18, 2007) ........ 16

*IRSAC Releases Notes on November Public Meeting*,
2005 Tax Notes Today 229-33 (Nov. 17, 2005) ........ 16, 53, 54

Dan L. Mendelson & Carol Conjura,
*FASITs – The Small Business Act's New Securitization Vehicle,*
85 J. Tax'n 278 (Nov. 1996) ........ 3, 13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

S. Rep. No. 104-281 ........................................ 12

Sheryl Stratton,
*Tax Arbitrage Not Inherently 'Evil,'*
*Treasury Official Says*,
110 Tax Notes (TA) 207 (Jan. 16, 2006) ........................................ 16

B. John Williams, Jr.,
*Chief Counsel Statement on Transfer Pricing,*
*International Tax Issues*,
2003 Tax Notes Today 54-47 (Mar. 18, 2003) ........................................ 16

## INTRODUCTION

This appeal raises two issues, both about how to characterize a financing arrangement that Aventis, Inc., entered into with one of its French affiliates and two other investors 26 years ago. Under the arrangement, Aventis received a substantial cash infusion up front. In exchange for that infusion and a small annual fee, Aventis performed services similar to the manager of a brokerage account: it agreed to manage certain assets that would be used for 5-30 years to generate returns for the investors, before the assets would be liquidated and their proceeds would be distributed to the investors. The questions here concern the ownership of those assets and the nature of the sums Aventis paid to the investors. The answers determine how much tax Aventis owes.

The first issue is whether the investors or Aventis should be treated as the assets' owners. There is no dispute that, under the arrangement, Aventis received and held those assets solely to generate income Aventis would use (and did use) to pay back the investors. By design, Aventis could keep neither the assets nor the income they produced, but was legally obligated to turn those sums (minus its small management fee) over to the investors. If

the investors were the assets' owners, then the income the assets produced didn't belong to Aventis and Aventis shouldn't be taxed on that income.

If the assets belonged to Aventis (even though Aventis was just managing them for the investors), then a second question arises: whether Aventis's payments to its French affiliate (the largest investor) should be treated as tax-deductible interest payments on a debt—the cash infusion the French affiliate gave Aventis.

This Court's caselaw and the uncontested facts—including the Tax Court's own factual findings and various stipulations and admissions the IRS made below—answer both questions. Aventis didn't own the assets it was managing for its investors. Aventis couldn't do anything with the assets except what was specified in the parties' contracts. It couldn't profit off their success; by the same token, it couldn't suffer any losses from their failure. That lack of control is incompatible with ownership. And assuming the Court nonetheless reaches the second question, Aventis's arrangement with the French affiliate was a debt because the parties intended for it to be a debt and structured their agreements to ensure that the affiliate would get paid back the money it advanced to Aventis, plus a sizable return. The Tax

Court's contrary conclusions irreconcilably conflict with its own factual findings, caselaw, and common sense. The Court should reverse.

**1.** From September 1997 through the end of 2004, the Tax Code recognized an investment vehicle called a "financial asset securitization investment trust"—or FASIT, for short. *See* Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1621(a), 110 Stat. 1755, 1858 (Aug. 20, 1996). Although the term FASIT is unfamiliar outside tax law, the concept is relatively straightforward, and FASITs were simply Congress's way of giving predictable tax treatment to financing arrangements it wished to encourage. Under the FASIT system, taxpayers could bundle together income-generating assets—usually non-mortgage debt instruments—and sell them to investors as a form of security. *See* Dan L. Mendelson & Carol Conjura, *FASITs—The Small Business Act's New Securitization Vehicle*, 85 J. Tax'n 278, 278-83 (Nov. 1996). As long as all of the participants met certain rules governing which assets could be included and how the investors' interests should be structured, Congress expressly codified substantial tax advantages. *Id.* at 283-90. The FASITs themselves were exempt from federal income taxes. *See* I.R.C. § 860H(a) (1997). And most of the investors' interests in the FASITs were treated as creditor interests on debts, *id.* § 860H(c)(1)

(1997), meaning that payments to the investors were treated as tax-deductible interest payments on those debts. Under longstanding tax principles, these interests could potentially have been treated as debt anyway, but Congress wished to give tax planning certainty to FASIT participants.

In 2000, Aventis entered into a FASIT arrangement with one of its French affiliates, Sanofi-Aventis Amerique du Nord S.A. (SAAN), and two other investors. As part of the deal, SAAN gave Aventis a $559,500,000 loan up front. In exchange for that loan and a 0.005% management fee, Aventis managed the FASIT's assets—which were separate from the loan—and made annual payments to the investors. While the FASIT was in effect, Aventis gave SAAN nearly $270 million in annual disbursements. And when the parties liquidated the FASIT in 2015, Aventis paid SAAN back the $559,500,000 it had originally advanced.

Unfortunately, unbeknownst to the parties, their FASIT arrangement was technically flawed. When the IRS examined Aventis's returns for the 2008, 2009, 2010, and 2011 tax years, it determined that the parties failed to meet all the technical requirements to give the arrangement FASIT status. As a result, it treated the FASIT assets as Aventis's corporate property, and increased Aventis's income taxes based on the income that the FASIT assets

had generated, even though the FASIT assets did not belong to Aventis, Aventis had distributed that interest to the FASIT investors, and one of the investors had acted as the assets' owner and paid taxes based on them during the life of the FASIT arrangement.

Aventis turned to the Tax Court for relief. It explained that even if it had inadvertently not complied with every technical requirement for FASIT treatment, it shouldn't be treated as the FASIT assets' owner for income tax purposes because it was managing those assets for the investors and didn't control or otherwise benefit from the assets. And even if it were considered the owner, Aventis explained, it should be permitted to deduct the money it sent to SAAN as interest payments on the debt it incurred when SAAN advanced Aventis the $559,500,000 at the start of the attempted FASIT. But the Tax Court sided with the IRS. The court held that Aventis beneficially owned the FASIT assets, and could thus be taxed on their income. JA39-JA40. Yet it also concluded that, despite the $559,500,500 loan from SAAN to Aventis, which Aventis was contractually obligated to repay, the FASIT transaction gave SAAN an *equity* interest in Aventis, rather than creating a debt from Aventis to SAAN. JA40-JA49. As a result, the court concluded, the money

Aventis paid SAAN could be taxed as dividends, rather than treated as tax-deductible interest payments. *Id*.

**2.** That was error at each step.

**a.** To start, Aventis didn't beneficially own the FASIT assets, and thus cannot be taxed on their income. This Court's decisions make clear that taxpayers can be taxed only on property (1) over which they have "actual command" and (2) from which they have "the right to receive the 'actual benefit,'" and the obligation to shoulder any associated burdens, "that accrue[] from ownership." *Geftman v. Commissioner*, 154 F.3d 61, 77 (3d Cir. 1998). Aventis satisfies neither requirement. The parties' contracts tightly restricted what Aventis could do with the FASIT assets. Aventis couldn't encumber them, sell them, decide what to do with their income, or even replace them with other assets except under narrowly defined circumstances prohibiting gain or loss. Aventis certainly didn't have "actual command" over the assets. And Aventis didn't share in the financial upside or downside from the assets' performance—all the risks and rewards were reserved for the FASIT investors. Nothing about Aventis's relationship with the assets resembles ownership as the law or ordinary meaning understands that term.

In concluding otherwise, the Tax Court contravened its own factual findings. Again and again, the Tax Court found that Aventis *lacked* control over the FASIT assets. To take just two examples, the Tax Court found that Aventis was contractually prohibited from "pledging, granting a security interest, assigning as a security, or otherwise encumbering the FASIT assets," and that "[a]ny gain realized in respect of FASIT assets was to be allocated to" the investors. JA18. But when it came time to apply those findings to the beneficial ownership question, the court seemingly forgot them, concluding that Aventis totally controlled the assets despite repeatedly recognizing the opposite earlier in its opinion. The court's decision to ignore its own findings was arbitrary and led to an incorrect result at odds with the court's own view of the record.

**b.** If, despite all that, the Tax Court was right that Aventis owned the FASIT assets, then the court erred by treating SAAN's interest in the FASIT arrangement as the acquisition of equity in, rather than a debt by, Aventis. This Court's decisions recognize that a debt exists when one party gives another money and both parties intend for the recipient to pay the money back. *See Merck & Co., Inc. v. United States*, 652 F.3d 475, 481 (3d Cir. 2011). In an equity arrangement, in contrast, one party gives the other

money, but knows it will be repaid only if the business succeeds. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).

The arrangement here was a debt transaction. Indeed, the parties were trying to create a FASIT, which would have created "a debt instrument" governing SAAN's interest. I.R.C. § 860H(c)(1) (1997). Consistent with that understanding, they structured the arrangement to ensure that SAAN would get its money back when the FASIT wound up. Every year, Aventis was required to use the proceeds from the FASIT to pay off the other two investors, and then had the option to send the remaining funds to SAAN. If it chose to send the proceeds to SAAN, that would function like the interest payments creditors ordinarily receive under debt instruments. But if Aventis chose not to send the money to SAAN, it couldn't just keep it. The parties' arrangement specified that Aventis had to reinvest the excess proceeds into new assets that would increase the portfolio's total value. In turn, SAAN was entitled to the bulk of the portfolio's value on liquidation, meaning it would eventually get paid back by annual distributions, its share of the liquidation proceeds, or both.

Unsurprisingly, that's exactly what happened. While the attempted FASIT existed, Aventis paid SAAN nearly $270 million. And when the

FASIT was liquidated, Aventis repaid SAAN the $559,500,000 it originally advanced. The arrangement was intended to be a loan, looked like a loan, and worked like a loan. That means it was a loan.

The Tax Court's contrary reasoning is unpersuasive. The court's decision to treat the arrangement with SAAN as an equity advance was driven by two key considerations: SAAN's interest was labeled stock, and SAAN wasn't formally guaranteed to receive payments from the FASIT every year. But this Court has repeatedly cautioned that "[l]abels … lose their meaningfulness" when the parties are corporate affiliates, like Aventis and SAAN. *See Fin Hay*, 398 F.2d at 697; *Geftman*, 154 F.3d at 75. It doesn't matter, the Court has held, that the creditor isn't formally guaranteed repayment if, practically speaking, the transaction is structured to ensure it. *See Merck*, 652 F.3d at 483. That's this case. Not only did the transaction's structure ensure that SAAN would be paid back by the time of liquidation, but all of Aventis's incentives were to give SAAN annual disbursements from the FASIT assets' proceeds. For one thing, the parties could obtain the tax benefits they envisioned through the FASIT structure only if Aventis made qualifying payments to SAAN—which is exactly what the parties thought Aventis was doing. For another, SAAN sits higher in the companies' corporate

organizational chart than Aventis, meaning SAAN could effectively direct Aventis to make payments. The Tax Court should have given effect to the arrangement's debt-like economic reality, as this Court's precedents require, rather than fixating on a handful of non-substantive formalities that deviate from a typical loan.

Under this Court's governing caselaw and the Tax Court's own factual findings, the IRS lacked the authority to increase Aventis's income tax burden for the years in question. The Court should reverse.

## JURISDICTIONAL STATEMENT

The IRS found that Aventis had tax deficiencies for the 2008, 2009, 2010, and 2011 tax years and assessed additional taxes. JA7-JA8. The Tax Court had jurisdiction under I.R.C. §§ 6213(a) and 6214(a) to hear Aventis's petition for a redetermination of the deficiencies. This Court has jurisdiction under I.R.C. § 7482(a) to review the Tax Court's decision. This appeal is timely because Aventis filed its notice of appeal on April 24, 2026, JA1, fewer than 90 days after the Tax Court entered its decision on January 30, 2026, JA4. *See* Fed. R. App. P. 13(a)(1).

## STATEMENT OF THE ISSUES

**1.** Whether the FASIT's investors, rather than Aventis, were the beneficial owners of the assets held by the financing arrangement, meaning that Aventis could not be taxed on those assets' income even if the financing arrangement did not qualify as a FASIT. This issue was preserved at T.C. Doc. 128 at 59-61 and T.C. Doc. 175 at 119-28. The Tax Court ruled on the issue at JA39-JA40.

**2.** Alternatively, whether SAAN's interest in the FASIT should be treated as debt, entitling Aventis to deductions for payments made on that instrument even if the arrangement did not qualify as a FASIT. This issue was preserved at T.C. Doc. 38 at 24-50, T.C. Doc. 128 at 51-59, and T.C. Doc. 175 at 128-51. The Tax Court ruled on the issue at JA40-JA49.

## STATEMENT OF RELATED CASES

This case has not previously come before this Court and Aventis is not aware of any other related cases or proceedings.

## STATEMENT OF THE CASE

### A. Legal background on FASITs

The case concerns the tax consequences from an unsuccessful attempt to create a financial asset securitization investment trust, or FASIT. Congress

authorized FASITs from September 1997 through the end of 2004 to ensure predictable (and favorable) tax consequences when businesses pool together certain non-mortgage debts as tradeable securities that could be sold to investors. *See* Small Business Job Protection Act, § 1621(a), 110 Stat. at 1858. Congress's goal was to encourage banks to spread the risk from their non-mortgage loans to investors, thereby reducing the federal deposit insurance system's overall financial exposure and encouraging banks to lower interest rates for consumers. *See* S. Rep. No. 104-281, at 126 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1474, 1600.

Under the FASIT regime, a qualifying company could elect to have specified assets treated as a FASIT for a given taxable year if it met two core requirements. *First*, "substantially all of the assets" in the FASIT had to consist of certain "permitted assets" specified by statute. *See* I.R.C. § 860L(a)(1)(D), (c) (1997). *Second*, the interests sold to investors had to consist only of "regular interests" and one "ownership interest." *Id.* § 860L(a)(1)(B)-(C). An interest qualified as a "regular interest" if it was "designated as such" on "fixed terms" and (i) entitled an investor to receive "a specified principal amount," (ii) had a fixed interest rate (with certain exceptions), (iii) the investor paid less than 125% of the principal amount to

acquire the interest, (iv) the estimated annual return was less than the applicable federal rate for the month when the interest was issued, plus 5%; and (v) the principal would be fully repaid within 30 years. *Id.* § 860L(b)(1). An interest qualified as an "ownership interest" if it was designated as an ownership interest and wasn't a regular interest. *Id.* § 860L(b)(2).

FASITs were attractive to companies seeking financing because they provided both "flexibility and certainty of tax treatment." *FASITs*, 85 J. Tax'n at 278. FASITs were exempt from federal income tax and could "not be treated as a trust, partnership, corporation, or taxable mortgage pool." *See* I.R.C. § 860H(a) (1997). "Instead, all of the FASIT's assets and liabilities [were] treated as assets and liabilities of the holder of the ownership interest and any income, gain, deduction, or loss of a FASIT [was] treated as that of the holder of the ownership interest." *FASITs*, 85 J. Tax'n at 278. Existing tax principles could have allowed these same tax results depending on how the investment was structured, but were less predictable since they would turn on the IRS's assessment of the investment's economic reality. The FASIT structure, by contrast, allowed parties to determine up front what tax treatment would apply.

Congress repealed the FASIT system in 2004. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 835(a), 118 Stat. 1418, 1593 (Oct. 22, 2004). But it allowed regular interests issued before the repeal to "continue to remain outstanding in accordance with the original terms of issuance"—that is, FASIT treatment would continue for those interests. *Id.* § 835(c). And it did not repeal basic tax law concepts that undergirded the FASIT system, such as the principle that only an asset's beneficial owner can be taxed based on its income.

**B. Factual background and procedural history**

**1.** Aventis is an American pharmaceutical company. JA7-JA8. It is an indirect subsidiary of Sanofi, S.A., a French pharmaceutical company. *Id*. During the late 1990s, Sanofi and Aventis expanded their operations in the United States, causing Aventis to look into external options to finance its growing business. JA7-JA10.

**2.** Aventis settled on creating a FASIT to sell interests in certain loans it had received from its corporate affiliates to investors. In July 2000, Aventis entered into a series of FASIT-related agreements with (i) Sanofi-Aventis Amerique du Nord S.A. (SAAN), one of Aventis's affiliates, (ii) Dynamo Investments, Inc., a subsidiary of the now-defunct Babcock & Brown

investment banking firm; (iii) BBH Capital, Inc., another Babcock & Brown affiliate; and (iv) Chase Manhattan Bank. JA9-JA10.

**a.** Under the arrangement, Aventis designated $571 million in intercompany loans it had received from one of its affiliates as the FASIT's assets and issued three FASIT interests. JA10-JA11. Aventis issued a "Class I Note" to Dynamo giving Dynamo the FASIT's ownership interest in exchange for $500,000. JA12. Aventis issued a "Class II Note" to Chase giving Chase a regular interest in exchange for $11.5 million. *Id*. And Aventis issued what it called "Series A/E stock" to SAAN giving SAAN a regular interest in exchange for $559,500,000. *Id.* Aventis was appointed the FASIT's asset manager in exchange for an annual fee equal to 0.005% of the FASIT assets' value. JA17.

As the Tax Court summarized, the "income generated by the FASIT assets was distributed annually to [Dynamo], [Chase], and [SAAN] on December 31 of each year." JA13. "First, the income from the FASIT was used to pay" Aventis's nominal asset manager fee. *Id*. "Second, the income was used to pay the interest due to" Dynamo and Chase "on their respective returns. *Id*. "Third, the remaining income was eligible to be distributed as dividends to [SAAN]." *Id*. If Aventis declined to declare a dividend, it was

required to reinvest the funds in the FASIT assets, increasing the value of those assets. JA17-JA18. And when the FASIT terminated, Aventis was required to distribute the fair market value of the FASIT assets to SAAN after paying back Dynamo's and Chase's relatively small investments. JA14-JA18.

The parties structured the attempted FASIT to take advantage of differences between U.S. and French tax law that would allow Aventis to treat any payments to SAAN as interest payments on a loan for U.S. tax purposes, while SAAN could treat those same payments as tax-advantaged dividends in France. As the IRS has repeatedly explained, there is nothing "nefarious" about "lawfully structur[ing] business transactions … to achieve economic benefits" from the "different tax standards and definitions" used by "different nations" with different systems. *See IRSAC Releases Notes on November Public Meeting*, 2005 Tax Notes Today 229-33, at 24 (Nov. 17, 2005); *see also, e.g.,* Sheryl Stratton, *Tax Arbitrage Not Inherently 'Evil,' Treasury Official Says*, 110 Tax Notes (TA) 207, 207 (Jan. 16, 2006); B. John Williams, Jr., Chief Counsel of the IRS, *Chief Counsel Statement on Transfer Pricing, International Tax Issues*, 2003 Tax Notes Today 54-47 (Mar. 18, 2003); Kevin Dolan, *Foreign Tax Credit Generator Regs: The Purple People Eater Returns*, 115 Tax Notes (TA) 1155, 1159 (June 18, 2007).

**b.** The Tax Court found that the FASIT arrangement placed significant limitations on Aventis's ability to control the FASIT's assets as the asset manager. Specifically:

- The contracts governing the FASIT arrangement "limited the type of assets that [Aventis] could choose as FASIT assets and referred to these assets as permitted assets." JA11.

- Aventis "was required … to hold the FASIT assets until maturity or redemption." JA18.

- Aventis could "replace" a FASIT asset only with another "permitted asset of equal principal amount," and even then only "so long as the replacement did not result in the realization of gain or loss to any person for U.S. federal income tax purposes and … the aggregate principal amount of the FASIT assets was at all times equal to the FASIT amount." *Id*.

- The relevant contracts "prohibited" Aventis "from (1) pledging, granting a security interest, assigning as a security, or otherwise encumbering the FASIT assets; (2) issuing any additional debt securities on parity with or senior to [Dynamo's or Chase's interests]; or (3) applying any income received from the FASIT assets in a manner other than as specified in the" relevant contracts. *Id*.

- Aventis "was required to invest FASIT earnings not distributed at yearend into additional permitted assets which would then be considered FASIT assets." *Id*.

**c.** The FASIT was originally scheduled to terminate in 2005, but it gave the parties the option to renew it in 5-year increments up to a total of 30 years. JA20. Over time, parties to the FASIT arrangement made various changes to the assets and entities involved. For example, Chase withdrew

from the FASIT in 2003 as part of swap in the loans that constituted the FASIT assets. JA19-JA20. And Dynamo was eventually sold to Chase when Babcock & Brown went defunct in 2009 after the late-2000s global financial crisis. JA20-JA21. But in substance, the FASIT continued until its parties elected to liquidate it in 2015. *Id*. At the time of liquidation, SAAN was re-paid in full the money it had contributed to the FASIT, plus additional dividends. JA185.

**3.** **a.** While the FASIT was in effect, Aventis treated Dynamo as the owner of the FASIT's assets for tax reporting purposes. JA21. When the IRS eventually examined Aventis's tax returns for the 2008, 2008, 2010, and 2011 tax years, however, it determined that the arrangement didn't qualify as a FASIT because the regular interest issued to SAAN did not meet all the applicable technical requirements. JA21. The IRS then reallocated the FASIT assets from Dynamo to Aventis and increased Aventis's income taxes by nearly $40 million over that four-year span. JA7-JA8.

**b.** Aventis sought Tax Court review. Aventis argued that:

- the FASIT was either entirely valid or substantially complied with Congress's rules governing FASIT treatment;

- if the FASIT was not valid, Aventis should not have been taxed based on the income from the FASIT assets because it was not their beneficial owner; and
- if nothing else, the IRS should have treated the interest issued to SAAN as a debt to SAAN, rather than equity in Aventis, meaning Aventis was entitled to deduct interest payments on the debt.

The Tax Court sided with the IRS on each issue.

***i.*** The court first determined that the FASIT was invalid from its inception. JA26-JA37. The court concluded that interest the relevant contracts gave SAAN didn't qualify as a "regular interest" because it didn't entitle SAAN to a set principal amount upon termination or a statutorily permissible interest rate. *Id.* And because the arrangement thus involved interests other than one "ownership interest" and a series of "regular interests," it couldn't qualify for FASIT status. *Id.* The court further concluded that the FASIT rules do not allow a substantial compliance defense. JA37-39.

Those two rulings are not at issue in this appeal.

***ii.*** The Tax Court next concluded that Aventis beneficially owned the FASIT assets while the attempted FASIT was in effect, and could thus be taxed on the income generated by those assets. JA39-JA40. In tax law, ownership of assets turns on who exercises control over the assets, enjoys their

benefits, and suffers their burdens, regardless of formal legal title. *See infra* pp. 29-31. Despite its earlier findings that the relevant contracts significantly restricted Aventis's control over the FASIT assets, the Tax Court concluded that Aventis had enough control over the assets to be considered their owner because it could replace the assets in the FASIT, "had legal recourse if debtors failed to make payment on the intercompany receivables," and the investors lacked downside risk from the assets. JA35. And despite its findings that Aventis wasn't entitled to any potential financial upside, or exposed to any potential financial downside, from the FASIT assets, the court concluded that Aventis had an ownership-like stake in those assets' performance. *Id.*

***iii.*** The court finally concluded that the interest Aventis issued to SAAN under the attempted FASIT was equity rather than debt, largely because the relevant transaction documents used labels like "stock" to describe it and SAAN wasn't guaranteed annual interest payments. JA40-JA49. The court accordingly concluded that Aventis could "not deduct amounts paid as dividends to SAAN as deductible interest payments." JA49.

## STANDARD OF REVIEW

**1. a.** This Court reviews de novo the Tax Court's legal determination that Aventis was the beneficial owner of the FASIT assets based on the facts the Tax Court found. *See Vento v. Director of Virgin Islands Bureau of Internal Revenue*, 715 F.3d 455, 468 (3d Cir. 2013).

**b.** The IRS may contend that whether Aventis beneficially owned the FASIT assets is a factual question, meaning the district court's resolution of that question should be reviewed for clear error. That would be incorrect. The beneficial ownership inquiry involves applying a legal standard to the facts—here, the facts as the Tax Court found them. How a legal standard applies to undisputed facts is a question of law that is reviewed de novo. *See, e.g.*, *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 23-24 (2021). Regardless, as explained below, the trial court's conclusion on the beneficial ownership question contravenes its own factual findings. And courts do not "extend … deference to internally inconsistent factual findings, which are, by definition, clearly erroneous." *In re Sentinel Management Group, Inc.*, 728 F.3d 660, 670 (7th Cir. 2013). Moreover, determining the correct "legal test" or "standard" is "a legal conclusion" that "an appellate panel reviews … without the slightest deference," meaning that, even where review is otherwise deferential, a

court of appeals "should apply de novo review" if the lower court "misunderstood the nature of the [substantive] query." *U.S. Bank National Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 393, 398 n.7 (2018). And that is what happened here, too, as explained below (at 33-38). So the Court should review the beneficial ownership question de novo regardless.

**2.** "The general characterization of a transaction for tax purposes is a question of law." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978). This Court accordingly reviews de novo the Tax Court's "ultimate characterization" of the interest Aventis issued to SAAN as part of the attempted FASIT as equity rather than debt. *See Merck*, 652 F.3d at 481.

## SUMMARY OF ARGUMENT

**I.** Aventis was not the beneficial owner of the FASIT assets and the Tax Court erred in concluding otherwise.

**A.** The IRS can impose income taxes only on property that a taxpayer beneficially owns. A taxpayer beneficially owns property if it has (1) "actual command over the property" and (2) "the right to receive the 'actual benefit'" and the responsibility to bear any associated burdens "that accrue[] from ownership." *Geftman*, 154 F.3d at 77.

The Tax Court's factual findings make clear that Aventis did not beneficially own the FASIT assets. Relevant to command, the court found that Aventis couldn't encumber the assets, decide when to sell or transfer them, decide what to do with the income they generated, or swap them for other assets (except on terms closely dictated by the FASIT parties' agreements—terms that did not permit any gain or loss). *See supra* p. 17. Relevant to the benefits and burdens of ownership, the court found that Aventis didn't keep the income generated by the assets (apart from a 0.005% management fee), wouldn't be allocated any losses, and was required to liquidate the assets and distribute the proceeds to the investors when the FASIT ended. *See infra* pp. 32-33. All of that indicates a *lack* of ownership, as this Court has recognized. *See Geftman*, 154 F.3d at 77-81. And that conclusion makes sense. Without control or consequences, "ownership" is an empty label.

**B.** The Tax Court's contrary conclusion contradicts its own factual findings and is thus erroneous and unpersuasive.

**1.** The court concluded that Aventis had command over the FASIT assets because Aventis "had the right to sell or dispose of, change, or modify" the assets, and the assets were on Aventis's books. JA40. But earlier in its opinion, the Tax Court found that Aventis *couldn't* freely sell, dispose of,

change or modify the assets in the FASIT. JA10-JA12, JA17-JA19. The court didn't even try to square its legal conclusion with the facts that it found—and it can't be done, because the two are fundamentally incompatible. Moreover, the reason beneficial ownership matters in tax law is that just possessing and having title to assets doesn't determine who owns them for tax purposes. *See Frank Lyon*, 435 U.S. at 572. Indeed, the Supreme Court, this Court, and other courts of appeals have been emphatically clear that the IRS can tax only income over which a taxpayer exercises complete control. The Tax Court thus erred by giving legal weight to the fact that the FASIT assets sat on Aventis's books, when Aventis was simply performing ministerial management services for other companies.

**2.** The Tax Court's analysis of who bore the benefits and burdens of ownership was even more off base. The court didn't bother to analyze which parties enjoyed the FASIT assets' potential *upside*. That wouldn't have supported its conclusion, because the court found that any money generated by the assets was required to go to the investors, not Aventis. JA13-JA14, JA17-JA19.

Instead, the court concluded that Aventis owned the assets because two of the investors—Dynamo and Chase—did not bear the risk that the

assets would generate losses or lose value. JA39-JA40. Although the court didn't explain its thinking, presumably its intended point was that if the investors didn't bear the assets' downside risk, Aventis must have, so Aventis must have been the true owner. But if that's what the Tax Court had in mind, it was error because no part of the logic works. The court found that Aventis did not bear any risk of loss from the assets because the parties' contracts allocated losses to the investors. JA17-JA19. Correspondingly, the investors did, in fact, bear all of the downside risk because they could get annual payments only if the FASIT assets generated income. There is no way to characterize those circumstances to support treating Aventis as the assets' owner.

**II.** Even if the Tax Court was right to treat Aventis as the FASIT assets' owner—and it wasn't—its ruling would still be incorrect. The court determined that SAAN received an equity, rather than debt, interest in the arrangement and declined to allow Aventis to deduct the payments to SAAN from its income as interest payments. That was error.

**A.** Distinguishing loans from equity advances requires a holistic inquiry where "the ultimate question" is "whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the

fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay*, 398 F.2d at 697. Although this Court has posited a number of factors that can aid the analysis depending on the case, *see id.* at 696, it has made clear that the dispositive question is whether the parties to a transaction intended that the party receiving money would eventually repay it. *See Geftman*, 154 F.3d at 68. Courts analyze "both" the "parties'" subjective "intentions" when they made the deal and "the objective characteristics of the transaction" to answer that question. *Merck*, 652 F.3d at 481.

**B.** The Tax Court's factual findings and other undisputed facts show that Aventis's arrangement with SAAN created a debt, not a grant of equity. The parties subjectively understood the arrangement as creating a debt instrument precisely because the statute governing FASITs at the time characterized investor interests like SAAN's "as a debt instrument." *See* I.R.C. § 860H(c)(1) (1997). And the objective indicia point the same way. The parties structured the arrangement so that SAAN would either receive annual interest-like payments from the income generated by the FASIT assets, or that income would be reinvested to purchase additional FASIT assets, the bulk of which would be liquidated and distributed to SAAN when the FASIT terminated. *See supra* pp. 14-16. Although the annual payments were not

formally guaranteed, Aventis had strong incentives to make them since that was the only way Aventis and SAAN could realize the tax benefits they envisioned from the deal. Since the deal's structure amounts to up-front payment by SAAN with a functional guarantee that Aventis would pay the money back later, it's a loan. *See Merck*, 652 F.3d at 483.

**C.** The Tax Court's contrary reasoning lacks merit. Although the Court purported to analyze a number of considerations, its bottom-line conclusion that SAAN was an equity holder under the attempted FASIT rather than a creditor was driven by just two: the parties labeled SAAN's interest "stock," and its annual payments weren't guaranteed. But this Court has repeatedly cautioned that "[l]abels … lose their meaningfulness" when the parties are corporate affiliates, like Aventis and SAAN here. *See Fin Hay*, 398 F.2d at 697; *Geftman*, 154 F.3d at 75. And the Court has held that it doesn't matter that the creditor isn't formally guaranteed repayment if, in practical terms, the transaction is structured to ensure it. *See Merck*, 652 F.3d at 483. The court should have focused on the arrangement's debt-like economic reality, rather than fixating on its form.

## ARGUMENT

### I. Aventis was not the beneficial owner of the FASIT assets and cannot be taxed as if it were.

The IRS couldn't tax Aventis based on the income generated by the FASIT assets because Aventis wasn't the beneficial owner of those assets. For tax purposes, a company is treated as the owner of property only when it controls the property, reaps its benefits, and suffers its burdens. *See Geftman*, 154 F.3d at 77. As the Tax Court's own findings show, Aventis doesn't satisfy any part of the test. It didn't control the FASIT assets because the parties' contracts tightly restricted Aventis's ability to encumber, sell, or swap them, or to decide what to do with the income and proceeds from the assets. Aventis didn't reap the benefits from the assets because those benefits were contractually promised to the FASIT investors. And Aventis didn't bear any downside risk from the assets' performance because the parties' contracts likewise allocated those risks to the investors. The Tax Court's decision to treat Aventis as the assets' owner was error, because it contradicts—without explanation—the court's own numerous detailed findings that Aventis didn't control the FASIT assets.

### A. The Tax Court's factual findings make clear that Aventis was not the beneficial owner of the FASIT assets.

#### 1. Ownership looks to economic reality and requires control of the property plus the right to its benefits and exposure to its burdens.

Unless Congress specifies otherwise, a company can be subject to income tax only based on assets it beneficially owns. *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955); *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 210 (1990). A company beneficially owns property if it controls that property—even if it lacks "formal legal title." *Frank Lyon*, 435 U.S. at 572; *accord Corliss v. Bowers*, 281 U.S. 376, 378 (1930) (Holmes, J.). In assessing beneficial ownership, this Court analyzes "the objective evidence provided by the" taxpayer's "overt actions" with respect to the disputed property to determine whether the taxpayer had (1) "actual command over the property" and (2) "the right to receive the 'actual benefit'" and exposure to any associated burdens "that accrue[] from ownership." *Geftman*, 154 F.3d at 77.

Those requirements have deep roots. As the Supreme Court explained nearly a century ago, "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed," so "[t]he

income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income." *Corliss*, 281 U.S. at 378. Put simply, for property "to be taxed for income, a taxpayer must have complete dominion over it." *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972); *see also Commissioner v. Banks*, 543 U.S. 426, 434 (2005). Those principles remain vital today. Indeed, the Eighth Circuit recently invoked that understanding to reverse a 9–8 decision of the Tax Court, rejecting both a Treasury regulation and the IRS's allocation of income. *See 3M Co. v. Commissioner*, 154 F.4th 574, 576, 582-84 (8th Cir. 2025). "For income to qualify" for taxation, the court explained, "'a taxpayer must have complete dominion over it,'" meaning the IRS could not tax the taxpayer on sums over which it lacked complete control, and the Tax Court was wrong to conclude otherwise. *Id.* at 579 (quoting *First Security*, 405 U.S. at 403).

This Court's decision in *Geftman* provides guidance here. There, a pair of corporations held legal title to three mortgages, but had transferred those mortgages to three trusts as part of a settlement. *Geftman*, 154 F.3d at 77. The Tax Court held that the trusts were beneficial owners of the mortgages based on book entries and after-the-fact documentation. *Id.*

This Court reversed. *Id.* at 77-82. The Court explained that the corporations had actual command over the mortgages because they pledged them as collateral for their loans, represented themselves as the "sole and lawful owners," used the mortgage proceeds for their own business purposes, and eventually sold them to third parties without obtaining the trusts' approval. *Id.* at 79. The corporations also received the mortgages' actual benefits because they had an exclusive right to the mortgages' income, collected all mortgage payments, and only forwarded mortgage-related income to the trusts at the corporations' sole discretion. *Id.* at 80-81. Since the corporations had the power to control and benefit from the mortgages, the Court held that the corporations—not the trusts—were the mortgages' beneficial owners. *Id.*

#### 2. Aventis didn't beneficially own the FASIT assets because it lacked control over them and had neither the right to benefit from them nor exposure to their burdens.

The Tax Court's factual findings make clear that Aventis did not have "actual command over" the FASIT assets or the right to benefit from them, and thus did not beneficially own those assets.

**Lack of control.** The Tax Court repeatedly and explicitly found that Aventis did *not* control the FASIT assets. Specifically, the court found that:

- Aventis was contractually prohibited from "pledging, granting a security interest, assigning as a security, or otherwise encumbering the FASIT assets." JA18.

- Aventis was "required … to hold the FASIT assets until maturity or redemption" and could replace FASIT assets only with other permitted assets of equal principal "so long as the replacement did not result in the realization of gain or loss." *Id*.

- Aventis had no discretion over how the FASIT income was allocated because the relevant contract "specified how [Aventis] was to apply income generated from the FASIT assets" in a mandatory waterfall paying investors first, with dividends only if Aventis's board declared them." *Id*.

In short, Aventis couldn't freely decide to use the FASIT assets as collateral, couldn't decide when to get rid of them, couldn't decide what to replace them with, and couldn't decide how to pay out income or dividends generated from them.

**No right to benefits or exposure to burdens.** The Tax Court also repeatedly found that Aventis lacked the right to benefit from the FASIT assets and was shielded from the assets' potential risks. The court found that:

- Aventis received only a set 0.005% annual asset management fee and all other FASIT income was required to be distributed to the FASIT investors. JA13-JA14, JA17-JA19.

- The relevant contracts specified how Aventis was to apply income generated from the FASIT assets. JA13-JA14.

- Upon termination of the attempted FASIT, Aventis was "required, within 90 days, to liquidate the FASIT assets, pay the

expenses of the FASIT, and use the remaining proceeds to redeem" Dynamo's and SAAN's interests with Aventis retaining nothing from those sales. JA20-JA21.

- "Any gain realized in respect of FASIT assets was to be allocated to [Dynamo] and any loss in respect of FASIT assets was to be allocated to [SAAN]." JA18.

In other words, other than a de minimis management fee, Aventis didn't share in the FASIT's income, sale value, or downside risks, which were all allocated to the investors.

### 3. *Geftman* makes clear that Aventis wasn't the beneficial owner of the FASIT assets.

These facts the Tax Court found here mirror the indicia that persuaded this Court in *Geftman* to find a lack of beneficial ownership. Like the trusts in *Geftman*, Aventis didn't have "actual command over" the FASIT assets because it lacked the power to dispose of them the way an owner can pledge, sell, or replace its property. *See* 154 F.3d at 77, 79. And like the trusts in *Geftman*, Aventis didn't have the right to benefit from the FASIT assets because it was contractually barred from realizing their proceeds. *Id.* at 80-81. Thus, just as the trusts were not the beneficial owners of the mortgages in *Geftman*, Aventis wasn't the beneficial owner of the FASIT assets. The IRS had no right to tax Aventis based on FASIT assets it didn't own.

### B. The Tax Court's contrary conclusion is internally contradictory and meritless.

In a few sentences that didn't engage with the evidence, the Tax Court concluded that Aventis was the FASIT assets' beneficial owner. That was error. The court's reasoning and conclusion directly contradict the factual findings it made earlier in its opinion.

#### 1. The Tax Court's control analysis contradicts its findings and rests on legal error.

Start with the court's analysis of "actual command," *Geftman*, 154 F.3d at 77. The court concluded that Aventis controlled the FASIT assets because it "had the right to sell or dispose of, change, or modify" the assets. JA40. But earlier in its opinion, the court found that Aventis (a) *didn't* have discretion to change the assets at will, since the relevant contracts specified what could be chosen as FASIT assets; and (b) *couldn't* dispose of the assets, since it was required to hold the assets until maturity and prohibited from changing the assets if doing so would cause a gain or loss. JA13-JA14, JA17-JA21. So by the Tax Court's own findings, Aventis didn't have "the right to sell or dispose of, change, or modify" the FASIT assets. JA40. The court didn't acknowledge those findings, much less explain how they can be squared with the mere couple of sentences it devoted to its control analysis.

The court also concluded that Aventis controlled the FASIT assets because it "held title" to and had "possession" over those assets. JA40. But the whole point of a beneficial ownership analysis is that title and possession aren't dispositive in tax law. As this Court explained in *Geftman*, "[t]rue ownership of property and the proper attribution of the income derived therefrom do not depend on legal title, for tax purposes, but rather turn on 'actual command over the property' and the right to receive 'the actual benefit' that accrues from ownership." 154 F.3d at 77. Or take it from Justice Holmes: "actual command," not "refinements of title," is the focus. *Corliss*, 281 U.S. at 378. The Tax Court committed legal error by focusing on title and possession rather than applying its multiple detailed factual findings that Aventis lacked control over the FASIT assets.

#### 2. The Tax Court's benefits and burdens analysis likewise contradicts its factual findings and rests on legal error.

The Tax Court's assessment of whether Aventis held "the benefits and burdens of the incidents of ownership," *Geftman*, 154 F.3d at 77, was equally flawed. The court ignored its findings that Aventis didn't have the right to any of the financial upside from the FASIT assets, apart from a de minimis management fee. JA13-JA14, JA17-JA19. Instead, in one sentence, the court

concluded that Aventis should be treated as the assets' owner "because Dynamo and Chase had no risks in relation to the underlying assets and were limited to the recourse provided in the Class I Note and the Class II Note." JA39-40. Although the Tax Court never said so explicitly, presumably its point was that if Chase and Dynamo didn't bear the risk of investment losses, Aventis must have borne that risk, meaning Aventis must have had the same kind of financial downside that the assets' owner would have. If that was the Tax Court's rationale, it fails for two reasons.

*First*, the court's focus on Dynamo's and Chase's investment risks asks the wrong question, meaning the court "misunderstood the nature of the … query" and this Court's review is de novo. *Lakeridge*, 583 U.S. at 398 n.7. "Normally, the owner of securities bears unlimited downside risk." *GWA, LLC v. Commissioner*, T.C. Memo. 2025-34, 2025 WL 1126982, at *48 (T.C. Apr. 16, 2025), *appeal filed*, No. 26-7 (2d. Cir. Jan. 5 2026). Accordingly, if a company has contractually limited its downside investment risk such that it "bore essentially no risk of loss," that tends to show that the company is not the securities' beneficial owner. *Id.* at *46. So the question the Tax Court should have asked is whether *Aventis* bore the risk of any financial losses from the FASIT assets—not Dynamo and Chase.

The record is clear that Aventis didn't bear any downside risk from the FASIT assets. The Tax Court expressly found that "any loss in respect of FASIT assets was to be allocated to the Series A/E Stock," which was owned by SAAN, and not Aventis. JA18. And that makes sense from a broader perspective. The transaction was structured so that Aventis would manage the FASIT assets; any income from those assets would be distributed to Dynamo, Chase, and SAAN; and Aventis could then deduct those sums from its income as interest payments. *See supra* pp. 14-16. The attempted FASIT did not envision that Aventis would (or could) keep the income generated from the FASIT assets, so it couldn't have borne the risk that such income would never materialize. Accordingly, the court's own findings show that Aventis didn't bear the risk of any losses from the FASIT assets, meaning it shouldn't have been treated as those assets' beneficial owner.

*Second*, any inference that Aventis must be the FASIT assets' owner because Dynamo and Chase bore no downside risk fails on its own terms. Dynamo and Chase could get paid interest and principal on the Class I and Class II notes only "from and to the extent of the FASIT Assets." JA99. In other words, Dynamo and Chase had no way to get paid if the FASIT assets

didn't generate income or if they lost all of their value. That is exactly the sort of risk Aventis simply did not have from the attempted FASIT.

* * *

The Tax Court's conclusion that Aventis beneficially owned the FASIT assets is clearly wrong, because it contradicts the court's own findings and rests on legal error. As the court's own findings show, Aventis didn't control the assets, reap their benefits, or suffer their downside risks. The court didn't even bother to explain how its ownership determination could be squared with any of those findings, because it can't. Aventis simply was not these assets' owner in any economically meaningful sense and should not have been taxed as if it was.

## II. If Aventis was nonetheless the beneficial owner of the FASIT assets, then it should have been permitted to deduct its payments to SAAN as interest payments on a debt.

The Tax Court shouldn't have treated Aventis as the FASIT assets' owner. But if this Court doesn't disturb that premise, then it should hold that Aventis should be permitted to deduct from its income the distributions it made to SAAN as interest payments on a debt, because SAAN held debt from, not equity in, Aventis.

A transaction creates debt when one party pays another party up front, and both parties intend for the recipient to pay the money back. *See Geftman*, 154 F.3d at 68. Aventis's arrangement with SAAN created debt. SAAN gave Aventis money up front in a transaction the parties intended to create debt under the FASIT regime. The parties contemplated that Aventis would pay SAAN back through annual payments. And the parties ensured that SAAN would still get paid back, even if the annual payments didn't occur, by requiring undistributed income from the FASIT assets to be plowed back into the FASIT, effectively increasing SAAN's payout when the FASIT was terminated and the assets were liquidated. All of that looks like debt. And that's exactly how the arrangement functioned in practice: Aventis made nearly $270 million in annual payments to SAAN and then repaid the original advance in full when the attempted FASIT terminated. The Tax Court's decision to treat SAAN's interest not as debt but equity rests largely on rote formalism and can't be squared with the transaction's economic substance.

### A. A transaction creates debt when one party lends money and both parties intend for the recipient to pay the money back.

**1.** In distinguishing between debt and equity, "the ultimate question" is "whether the investment, analyzed in terms of its economic reality,

constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay*, 398 F.2d at 697. "The substance of a transaction, rather than its formal characterization, has always dictated its tax treatment." *Merck*, 652 F.3d at 481. Accordingly, "[t]o determine whether a given transaction constitutes" debt or equity, "the substance, rather than the form, of the transaction is controlling." *Karns Prime & Fancy Food, Ltd. v. Commissioner*, 494 F.3d 404, 408 (3d Cir. 2007).

**2.** Debt requires "an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment." *Geftman*, 154 F.3d at 68. The parties' intent is assessed as of the "the time of the transaction." *Id.* at 69. Courts analyze "both" the "parties'" subjective "intentions" and "the objective characteristics of the transaction" to determine whether this standard is met. *Merck*, 652 F.3d at 481.

This Court has suggested as many as 16 factors to consider in distinguishing between debt and equity. *See Fin Hay*, 398 F.2d at 696. But it has emphasized that the most important factors in evaluating whether a transaction created debt are "any … attributes" of the arrangement "indicative of an enforceable obligation to repay the sums advanced." *Geftman*, 154 F.3d at

68; *accord Scriptomatic, Inc. v. United States*, 555 F.2d 364, 370 (3d Cir. 1977). No "single criterion" is dispositive, *Fin Hay*, 398 F.2d at 697, and "the criteria which will be relevant … will vary from case to case, as will the weight which should be accorded each criterion," *Scriptomatic*, 555 F.2d at 368.

**3.** This Court has repeatedly held that transactions created debt when they were objectively structured to ensure one party would repay money it received from another party, even if repayment was not totally guaranteed. For example, in *Merck*, this Court held that a transaction created debt because the transaction documents "referred to balances, 'payment,' 'interest,' and 'principal reduction,'" and the deal was structured to require one party to make floating interest payments at a rate that would make repayment of the money given to it by the other party very likely, even though it wasn't absolutely guaranteed. 652 F.3d at 483. Similarly, in *Scriptomatic*, this Court rejected the IRS's argument that a transaction created equity rather than debt, because the relevant "instruments contain[ed] a fixed payment date, provide[d] for a commercially reasonable rate of return, contain[ed] an unconditional promise to repay and 'the right to force complete payment in the event of a default in payment of either interest or principal,'

and [were] not automatically subordinated to the claims of tradesmen and vendors." 555 F.2d at 372.

### B. The attempted FASIT created a debt from Aventis to SAAN, not a grant of equity to SAAN.

Both the parties' subjective intentions at the time of the transaction and the objective characteristics of their attempted FASIT structure indicate that the transactions created a debt from Aventis to SAAN, not a grant of equity from Aventis to SAAN.

#### 1. The parties' undisputed subjective intentions at the time of the transactions were to create debt.

Start with the parties' subjective intentions. *See Merck*, 652 F.3d at 482. No one disputes that the parties thought they were entering into a valid FASIT arrangement in 2000 that granted SAAN a statutorily-defined "regular interest." Indeed, the parties acted as if the FASIT was valid for 15 years until they terminated it in 2015. When the parties created the attempted FASIT, the Small Business Job Protection Act provided that "a regular interest in a FASIT, if not otherwise a debt instrument, shall be treated as a debt instrument." I.R.C. § 860H(c)(1) (1997). So the parties would have believed at the time that the interest granted to SAAN—which the parties intended to be a "regular interest" for FASIT purposes, JA12—would be treated like a

debt instrument no matter how they labeled it in the transaction documents. The Tax Court's contrary conclusion 26 years later that SAAN's interest wasn't a valid regular interest doesn't change what the parties would have expected when they tried to create the FASIT.

Other uncontested facts reinforce the conclusion that the parties thought Aventis was creating a debt to SAAN. The Tax Court found that when Babcock & Brown approached Aventis with the FASIT idea, it told Aventis that the payments to SAAN would be "deductible … as interest payments on debt under the FASIT rules." JA9. And the IRS stipulated that the FASIT transaction documents "required" Aventis and Dynamo "to treat" the interest granted to SAAN "as a regular interest in the FASIT for U.S. federal income tax purposes," and that Dynamo followed that instruction by deducting the payments to SAAN as interest payments on its tax return. JA179. The record is clear: when the relevant transactions occurred in 2000, the parties thought they were creating a FASIT transaction that would be treated as creating debt.

### 2. The objective characteristics of SAAN's interest confirm that the parties intended it to be debt, not equity.

The "objective characteristics," *Merck*, 652 F.3d at 481, of the interest granted to SAAN also show that the parties intended for it to create a debt with repayment obligations, and not an equity interest in Aventis.

To start, the attempted FASIT transaction had robust safeguards that effectively guaranteed SAAN repayment of the money it transferred to Aventis—just like a loan. As the Tax Court recounted, at the end of each year, Aventis was required to use the earnings from the FASIT assets to pay its nominal management fee, the FASIT's expenses, and certain interest to Dynamo and Chase. JA14. Aventis then had the option to distribute the remaining funds to SAAN by declaring a dividend. If it declined to declare a dividend, Aventis was require to reinvest the funds in the FASIT assets, increasing the value of those assets. JA17-JA19. And when the FASIT terminated, Aventis was required to distribute the fair market value of the FASIT assets to SAAN after paying back Dynamo's and Chase's relatively small investments. *Id*.

Put simply, the transaction structure ensured that SAAN would be paid back for the money it gave Aventis through annual dividends, a back-

end liquidation payment that would increase every time Aventis didn't declare a dividend, or some combination of the two. That is strong evidence that the transaction was intended to be a loan, rather than a grant of equity. *See Merck*, 652 F.3d at 481.

And the structure worked exactly as intended. Aventis made year-end payments to SAAN every year from 2000 to 2011 (except for 2001), totaling nearly $270 million. JA14-JA16. That was hardly surprising, since uncontradicted testimony showed that SAAN sat higher in the Sanofi corporate family's organizational chart and thus effectively had the power to require Aventis to make the dividend payments. JA200. And when the attempted FASIT was liquidated in 2015, SAAN was repaid the original $559,500,000 million it gave to Aventis on top of the $270 million it had already received. JA185. So the arrangement with SAAN ultimately functioned like a loan. SAAN gave Aventis $559,500,000 for a period of 5-30 years, and Aventis paid it back in 15 years with a nearly 50% return.

### 3. Other indicia confirm that SAAN's interest was debt, not equity.

Several other indicia this Court has identified as relevant to distinguishing debt from equity, *see Fin Hay*, 398 F.2d at 696, likewise support treating SAAN's interest as debt, not equity.

**Aventis's ability to obtain funds from third-party creditors.** This Court has held that "[i]f … an outsider would have advanced funds on terms similar to those agreed to by the shareholder[], the obligation is debt." *Scriptomatic*, 555 F.2d at 368. Here, the Tax Court's factual findings show that Aventis could—and did—secure outside financing on terms similar to what SAAN enjoyed. Chase Manhattan Bank agreed to participate in the attempted FASIT on similar terms to SAAN's, including annual payments from the income generated by the FASIT assets and repayment obligations at liquidation. JA10-JA19. That is strong evidence that the arrangement with SAAN was debt, not an equity grant. *See Scriptomatic*, 555 F.2d at 368.

**Transaction risk and source of payments.** A key factor in determining whether an instrument creates debt or equity interests is whether a party's payment obligations are contingent on or tied to the success or failure of its business. *See Calumet Industries, Inc. & Subsidiaries v. Commissioner*, 95 T.C.

257, 287 (1990). If the party must pay no matter how its business performs, that is an indication that the instrument creates debt. But if the party pays only when its business is profitable, that can be an indication that the instrument confers equity. *See id.* Here, none of Aventis's obligations under the attempted FASIT was tied in any way to its underlying pharmaceutical business. To the contrary, the Tax Court found that payments to SAAN "on the Series A/E Stock were funded by the undistributed profits of the FASIT only, and not from any of [Aventis's] other assets." JA48. That finding is inconsistent with an equity arrangement, which would have given a holder a stake in Aventis's business tied to the success of Aventis's business. But it is perfectly consistent with a debt interest, which typically entitles the noteholder only to payments and interest on the debt.

**How Aventis used the money it received from SAAN.** As this Court has observed, lenders are often reluctant to loan money to a company to buy the initial assets it needs to get its business off the ground because the corporation's ability to repay the advance is speculative and dependent on the success of its business. *See Fin Hay*, 398 F.2d at 698. In contrast, it is common for venture capitalists to give startups money in exchange for equity. So whether a corporation uses the money it receives to build its core operations

or an important new venture can be indication of whether the money was a loan or equity advance. *See id.*

Here, Aventis was a fully mature major pharmaceutical company when it participated in the attempted FASIT. And the IRS acknowledged that Aventis loaned some of the money it received from SAAN to other affiliates and used the rest to retire debt rather than to support its core business activities. JA202. That is another indication that the arrangement with SAAN was the kind of transaction that Aventis could have pursued with a third-party lender, rather than the kind of equity investment that would only have been available from a venture capitalist.

### C. The Tax Court's contrary conclusion misapplies this Court's caselaw and contradicts the record.

The Tax Court evaluated 11 of this Court's 16 *Fin Hay* factors for distinguishing between debt and equity, *see* 398 F.2d at 696; decided that they all favored the IRS; and therefore declared that "the intent of the parties" was "that the Series A/E Stock was equity." JA49. That was error. The Tax Court misunderstood both the legal standard and the economic reality of the attempted FASIT arrangement.

As a general matter, the Tax Court took the wrong approach—a misunderstanding that again amounts to legal error. *See supra* pp. 21-22. In *Fin Hay* itself, this Court emphasized that "neither any single criterion nor any series of criteria can provide a conclusive answer" as to whether a particular arrangement creates debt or equity. 398 F.2d at 697. It is thus a mistake, the Court has emphasized, to give the *Fin Hay* criteria "talismanic significance." *Scriptomatic*, 555 F.2d at 367. The Tax Court should have assessed the evidence holistically to determine whether the parties contemplated that SAAN would be paid back through the FASIT, rather than tallying up a list of non-exclusive factors and declaring an answer by weight of numbers.

The Tax Court's analysis also lacks merit even on its own terms. Much of the court's analysis boils down to two observations: the parties called SAAN's interest "stock" and SAAN wasn't guaranteed annual interest payments. But that analysis ignores the transaction's economic substance and the parties' incentives, which were structured to ensure that SAAN would be repaid for the money it advanced to Aventis. And in fact, SAAN was repaid in full with a handsome return. The Tax Court's analysis fails to account for these realities or provide any reason to disregard the FASIT's core, debt-

like economic structure. Those failures too reflect "legal error infecting" the decision and thus enjoy no deference. *See Lakeridge*, 583 U.S. at 398 n.7.

### 1. The parties' intent, how the transaction documents were labeled, and SAAN's voting rights do not support treating SAAN's interest as equity.

**a.** The Tax Court concluded that if it ignored Aventis's "intent to implement a FASIT," "the parties to the FASIT" subjectively "intended the Series A/E Stock to be equity" because it was labeled "stock" in the transaction documents, pre-transaction promotional materials, and certain accounting records. JA42-JA47. That was error, as this Court's caselaw makes clear. It makes no sense to ignore what the parties were trying to accomplish with these transactions when determining how to characterize them. The Tax Court was required to determine how the parties viewed the transaction at the time they entered into it. *See Geftman*, 154 F.3d at 68. And in 2000, the parties thought they were giving SAAN a regular interest in a FASIT, which was "treated as a debt instrument" under governing law. I.R.C. § 860H(c)(1) (1997). The Tax Court erred by ignoring the governing legal framework that would have set the parties' expectations. *See Lakeridge*, 583 U.S. at 398 n.7.

The Tax Court also erred by focusing on how SAAN's interest was labeled, rather than its economic substance. This Court has held that in transactions between corporate affiliates like Aventis and SAAN, "[l]abels … lose their meaningfulness" because the parties aren't negotiating at arm's length and can make the transaction take any form that would be convenient under the circumstances. *See Fin Hay*, 398 F.2d at 697; *Geftman*, 154 F.3d at 75. And it was particularly troubling in these circumstances to focus on how the transaction was labeled. The Small Business Job Protection Act specified that the FASIT would be treated as debt no matter what labels the parties chose, *see* I.R.C. § 860H(c)(1) (1997), so they had no incentive to be choosy in picking terminology and nomenclature. And as the Tax Court recognized, the parties anticipated that Aventis's payments to SAAN under the attempted FASIT would be treated as dividends under French tax law and interest payments under U.S. tax law, meaning there would have been a mismatch in terms no matter what labels the parties chose. JA9-JA10. The court should thus have given no weight to how SAAN's interest was labeled and instead focused on the transaction's debt-like economic substance.

**b.** The Tax Court also concluded that the "objective features of the Series A/E Stock" showed that the parties intended for SAAN's interest to

be treated as equity because the Series A/E stock gave SAAN voting rights, the potential for dividends, and the power to appoint a seat on Aventis's board. JA42-JA47. But courts have recognized that supposedly increased corporate rights aren't a meaningful indicator of how the parties intended the transaction to function when the parties are controlled by the same entity because such concessions do not substantively alter either party's relative authority. *See NA General Partnership v. Commissioner*, T.C. Memo. 2012-172, 2012 WL 2344719, at *8 (T.C. June 19, 2012); *PepsiCo Puerto Rico, Inc. v. Commissioner*, T.C. Memo. 2012-269, 2012 WL 4207299, at *28 (T.C. Sept. 20, 2012). That is the case here because Aventis and SAAN are both subsidiaries of Sanofi and SAAN owned Aventis indirectly through another subsidiary. JA8; T.C. Doc. 175 at 11 n.7. Put differently, the attempted FASIT didn't give SAAN any powers or voting rights over Aventis that it didn't already have. So the Tax Court shouldn't have given any weight to the voting rights granted under the agreement. If anything, the fact that SAAN already indirectly owned Aventis should have cautioned the Tax Court against construing the transactions as giving SAAN additional unneeded equity.

### 2. SAAN's interests as both a creditor and stockholder of Aventis do not support an equity finding.

The Tax Court also reasoned that SAAN's interest in the FASIT was more like a shareholder's than a creditor's because the transaction created tax benefits for SAAN, Aventis, and their affiliates, so SAAN had no incentive to enforce its repayment rights and risk upsetting the FASIT structure. JA42-JA44. That doesn't make sense. The transactions envisioned two tax main tax benefits: Aventis could deduct the payments it made to Dynamo, Chase, and SAAN from its income as interest payments, "and SAAN under French tax laws [c]ould treat the [payments] as nontaxable dividends." JA10. Neither Aventis nor SAAN could realize those tax benefits if Aventis failed to distribute the income from the FASIT assets to SAAN. So SAAN's incentive was to act like a creditor and insist on repayment so it could obtain the tax benefits the parties envisioned when they created the FASIT. The Tax Court's contrary conclusion simply misunderstands the transaction.

To the extent the Tax Court disfavored Aventis's position because the payments to SAAN were "part of a tax arbitrage transaction," JA43-JA44, that was error. As the IRS itself has repeatedly explained, there is nothing "nefarious" about "lawfully structur[ing] business transactions … to achieve

economic benefits" from the "different tax standards and definitions" used by "different nations" with different systems. *See IRSAC Releases Notes on November Public Meeting*, 2005 Tax Notes Today 229-33, at 24; *supra* p. 16 (collecting authorities). The fact that Aventis and SAAN wanted to structure the deal to lawfully obtain favorable tax treatment from both U.S. and French authorities was no reason to ignore the transaction's economic reality and treat it as equity under U.S. law.

**3. The various factors related to SAAN's ability to obtain repayment and whether Aventis could have secured financing on similar terms from outside creditors do not support treating SAAN's interest as equity.**

The Tax Court concluded that "the risk involved" in the transaction, *Fin Hay*, 398 F.2d at 696, supported treating SAAN's interest as equity. The court reasoned that SAAN's interest was "riskier than traditional debt instruments" because there weren't sufficient: (1) "constraint[s] on the credit worthiness of the FASIT assets"; (2) "remedies or recourse if [Aventis] violated terms of the Series A/E Stock"; or (3) structural mechanisms to ensure SAAN was repaid over the life of the FASIT, particularly since the transaction contemplated that SAAN would be paid after Dynamo and Chase and Aventis was not required to make annual payments. JA44-JA49. Based on

those perceived risks, the court concluded that Aventis wouldn't have been able to secure financing on similar terms from third-party creditors. JA44-JA45. The court's reasoning fails on three levels.

*First*, the record doesn't establish any reason to think that the assets included in the attempted FASIT were particularly risky. As this Court has recognized, "there is often an element of risk in a loan, just as there is an element of risk in an equity interest." *Fin Hay*, 398 F.2d at 697. Here, the supposed lack of creditworthiness constraints on the assets in the FASIT didn't stop Dynamo, a subsidiary of a prominent investment bank, or Chase, a major national bank, from choosing to invest. JA10-JA14. And in fact, the FASIT paid off handsomely for its investors, including SAAN, which received nearly $270 million in distributions during the FASIT in addition to recovering its initial investment in full upon liquidation—a 50% return. JA14-JA16. The record thus contradicts the Tax Court's conclusion that the assets were so risky that they couldn't attract outside creditors.

*Second*, the Tax Court's assertion that SAAN had no "remedies or recourse if [Aventis] violated terms of the Series A/E Stock," JA45, was just plain wrong. As the IRS conceded below, if Aventis "violated the terms of the Series A/E Stock, [SAAN] would be entitled to the same rights as any

party to a contract whose counterparty fails to uphold the agreement." JA204. Similarly, if Aventis violated the underlying FASIT contracts, SAAN "would have the same rights available to any party who entered into an agreement with another party who violates the terms of that agreement." *Id.* And if Aventis "declared a dividend on the Series A/E Stock, but failed to pay over that dividend," SAAN "would have the same legal right to enforce payment" as any other litigant. JA203. Even the IRS agrees that SAAN had remedies to compel compliance with the transaction's terms.

*Third*, the court's claim that the FASIT must have given SAAN an equity interest because SAAN lacked any way to secure repayment or guarantee annual payments misapprehends the law, the transaction's structure and the parties' incentives. Start with the law. In *Merck*, this Court held that "a formal 'legal obligation'" to repay "is not an absolute prerequisite for a determination that a transaction is a loan." 652 F.3d at 483. Instead, a transaction can constitute a loan if "the evidence shows that the Transactions were deliberately planned, as a practical matter, so as to ultimately provide [the creditor] with repayment of the funds transferred." *Id.* So the court should not have fixated on whether SAAN was guaranteed payment. It should have

instead assessed how likely SAAN was to be repaid under the transaction's structure. *See id.*

The structure here shows that SAAN had very little risk of not being paid back. Under the attempted FASIT, Aventis could either distribute income from the FASIT assets to SAAN (after paying Dynamo and Chase their share) or reinvest those assets in the FASIT, thus making its asset pool more valuable. JA17-JA18. And SAAN was entitled to receive the assets' fair market value at liquidation after repaying Dynamo's and Chase's much smaller investments. *Id.* So the transaction effectively ensured that SAAN would be repaid either through dividends, liquidation, or both. That is, in fact, what happened: Aventis made nearly $270 million in payments to SAAN during the FASIT's lifespan and then repaid the initial advance in full at liquidation, giving SAAN a nearly 50% return. JA14-JA16, JA185.

Beyond all that, the parties' incentives also made it highly certain from the outset that Aventis would choose to make annual payments from the FASIT assets' income to SAAN. Only if Aventis actually made those payments could the parties could achieve the tax benefits they envisioned from the transaction—Aventis getting to deduct the payments to SAAN from income, and SAAN getting to treat the payments as nontaxable income under

French law, JA10-JA11. And because SAAN is higher on the corporate ladder than Aventis, SAAN also had the option to direct Aventis to make the payments. JA200. If anything, SAAN had more control—and thus less risk—than a typical creditor.

**4. The source of payments to SAAN does not support treating SAAN's interest as equity.**

The Tax Court decided that "the source of the … payments" to SAAN, *Fin Hay*, 398 F.2d at 696, favored treating SAAN's interest as equity because the payments could come only from the FASIT assets' earnings, making them more like an investment than a loan with unconditional repayment obligations. JA45-JA49. But as noted (at 43-45, 55-57), SAAN was virtually assured repayment because the transaction structure required Aventis to liquidate the FASIT assets within 30 years and use their proceeds to pay back SAAN, meaning SAAN's repayment was not meaningfully contingent on the FASIT assets' performance. Under these circumstances, the fact that SAAN could only be paid out of the FASIT assets' proceeds did not create meaningful investment risk, and the court should thus have given this factor minimal weight.

### 5. The timing of SAAN's payment to Aventis does not support treating SAAN's interest as equity.

The Tax Court next reasoned that the "timing" of SAAN's purchase of its interest in the FASIT, *Fin Hay*, 398 F.2d at 696, shows that the interest was equity because it "represent[ed] a long-term commitment dependent on the future value of the [FASIT] assets." JA49. But that misses the point. The timing factor assesses whether the corporation used the money it received to set up its business. *See Fin Hay*, 398 F.2d at 696. If so, that can be an indication that the transaction was an equity advance because the investor can only be repaid if the business succeeds. *See id.* If not, the timing factor favors treating the transaction as debt because a mature business can repay its obligations no matter whether any new ventures are successful.

Here, Aventis didn't use the money SAAN provided to set up its pharmaceutical business or even to purchase the FASIT assets. So the court should have found that this factor favored treating the transaction as a loan.

* * *

As the old saw goes, if something looks like a duck and quacks like a duck, it probably is a duck. The parties here thought they were entering into a FASIT arrangement. Congress called that arrangement a debt; it looked

like a debt because SAAN gave Aventis money under a transaction and incentive structure that made it likely Aventis would pay the money back; and it functioned like a debt because Aventis made regular payments to SAAN and then paid all of the initial money back at the end. That all means it was a debt. The Tax Court erred by simply ticking through (and usually misapplying) the *Fin Hay* factors while ignoring the big picture reality that Aventis and SAAN's arrangement bears all the hallmarks of a debt. If Aventis was the assets' beneficial owner, it should have at least been allowed to deduct the payments it made to SAAN from its income as interest payments.

## CONCLUSION

The Court should reverse the Tax Court's judgment.

Dated: September 21, 2026

Respectfully submitted,

/s/ Parker Rider-Longmaid

Parker Rider-Longmaid
*Counsel of Record*
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

Shay Dvoretzky
Rajiv Madan
Christopher P. Bowers
Nathan P. Wacker
Kevin R. Stults
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Ave. of the Stars,
Ste. 200N
Los Angeles, CA 90067

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Petitioner-Appellant Aventis, Inc., and Subsidiaries*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that (1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 31.1(c) because, as calculated by Microsoft Word, it contains 12,629 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6), and with Local Rule 32.1(c), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in a 14-point Book Antiqua font; (3) this brief complies with Local Rule 31.1(c) because the text of the hard copies of this brief filed with this Court and the electronic brief are identical, and because Microsoft Defender Antimalware Client Version 4.18.25110.6 Antivirus Version 1.449.578.0 was run on this electronic brief and no virus was detected; and (4) that, pursuant to Local Rules 28.3(d) and 46.1(e), I am a member of the bar of this Court.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Parker Rider-Longmaid*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

*Counsel for Petitioner-Appellant Aventis, Inc., and Subsidiaries*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Parker Rider-Longmaid*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

*Counsel for Petitioner-Appellant Aventis, Inc., and Subsidiaries*

No. 26-2027

In the
# United States Court of Appeals
## for the Third Circuit

AVENTIS, INC., AND SUBSIDIARIES,

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Defendant-Appellee*.

On Appeal from the United States Tax Court, No. 11832-20
Hon. Kathleen Kerrigan, *Judge of the United States Tax Court*

**JOINT APPENDIX VOLUME 1 OF 2 (JA1 – JA50)**

*Counsel information on inside cover*

Douglas C. Rennie
*Counsel of Record*
U.S. DEPARTMENT OF JUSTICE,
CIVIL DIVISION, TAX LITIGATION
BRANCH, APPELLATE SECTION
950 Pennsylvania Ave., NW
P.O. Box 502
Washington, DC 20044
Telephone: 202-305-7546
douglas.c.rennie@usdoj.gov

*Counsel for Respondent-Appellee*
*Commissioner of Internal Revenue*

Parker Rider-Longmaid
*Counsel of Record*
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

Shay Dvoretzky
Rajiv Madan
Christopher P. Bowers
Nathan P. Wacker
Kevin R. Stults
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Raza Rasheed
Skadden, Arps, Slate,
Meagher & Flom LLP
2000 Ave. of the Stars,
Ste. 200N
Los Angeles, CA 90067

Jeremy Patashnik
Skadden, Arps, Slate,
Meagher & Flom LLP
One Manhattan West
New York, NY 10001

*Counsel for Petitioner-Appellant*
*Aventis, Inc., and Subsidiaries*

# TABLE OF CONTENTS

**Page**

## Volume 1


Aventis, Inc., and Subsidiaries' Notice of Appeal
(April 24, 2026) (Doc. 180) .......... JA1

Decision Finding Deficiencies in Tax Due
(January 30, 2026) (Doc. 179) .......... JA4

Opinion (January 28, 2026) (Doc. 178) .......... JA5


## Volume 2


Docket for *Aventis, Inc., and Subsidiaries v. Commissioner of Internal Revenue,* No. 11832-20
(T.C.; filed September 23, 2020) .......... JA51

First Stipulation of Facts (May 26, 2023) (Doc. 24) .......... JA78

Exhibit 23-J: Class I Note issued by RPRIH in favor of Dynamo in the amount of $500,000, dated July 21, 2000 .......... JA96

Second Stipulation of Facts (August 29, 2024) (Doc. 87) .......... JA106

Third Stipulation of Facts (January 30, 2025) (Doc. 134) .......... JA124

Fourth Stipulation of Facts (January 31, 2025) (Doc. 135) .......... JA134

Fifth Stipulation of Facts (January 31, 2025) (Doc. 141) .......... JA175

Sixth Stipulation of Facts (January 31, 2025) (Doc. 143) .......... JA188

Seventh Stipulation of Facts (February 10, 2025) (Doc. 155) .......... JA195

Trial Transcript Volume 2: Proceedings on February 11, 2025
(March, 3, 2025) (Doc. 168) (excerpted) .......... JA199

## TABLE OF CONTENTS
(continued)

**Page**

Commissioner of Internal Revenue's Simultaneous
Opening Brief (June 4, 2025) (Doc. 174) (excerpted)............................ JA202

**Received** 04/24/26 03:07 pm

**Filed** 04/24/26

Aventis, Inc. and Subsidiaries,

Petitioner

v.

Commissioner of Internal Revenue

Respondent

Electronically Filed
Docket No. 11832-20
Document No. 180

# Notice of Appeal for the 3rd Circuit

**Received** 04/24/26 03:07 pm

**Filed** 04/24/26

Aventis, Inc. and Subsidiaries,

Petitioner

v.

Commissioner of Internal Revenue

Respondent

Electronically Filed
Docket No. 11832-20
Document No. 180

# Notice of Appeal

**SERVED 04/24/26**

# UNITED STATES TAX COURT

AVENTIS, INC. AND SUBSIDIARIES,

Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent.

Docket No. 11832-20

Judge Kerrigan

Filed Electronically

## NOTICE OF APPEAL

Notice is hereby given that Aventis, Inc. and Subsidiaries appeals to the United States Court of Appeals for the Third Circuit from the decision entered in the above-captioned proceeding on January 30, 2026.

Date: April 24, 2026

Respectfully Submitted,

Rajiv Madan
Tax Court Bar No. MR1190
SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Tel: (202) 371-7020
raj.madan@skadden.com
*Counsel for Petitioner*

# United States Tax Court
Washington, DC 20217

AVENTIS, INC. AND SUBSIDIARIES,

Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent

Docket No. 11832-20

**DECISION**

Pursuant to the determination of the Court, as set forth in its Opinion (166 T.C. No. 1), filed January 28, 2026, it is

ORDERED and DECIDED that there are deficiencies in tax due from petitioner in the amounts of $10,469,002 for tax year 2008; $9,331,096 for tax year 2009; $9,338,611 for tax year 2010; and $9,330,260 for tax year 2011.

**(Signed) Kathleen Kerrigan**
**Judge**

**Entered and Served 01/30/26**

# United States Tax Court

166 T.C. No. 1

AVENTIS, INC. AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

---

Docket No. 11832-20. Filed January 28, 2026.

---

In 2000 P, a domestic corporation; A, P's French affiliate; B, an advisor to P; and C, a third-party bank, entered into a securitization transaction that the parties to the transaction purported to be a financial asset securitization investment trust (FASIT) under I.R.C. §§ 860H through 860L. I.R.C. §§ 860H through 860L were repealed in 2004, but P's purported FASIT remained in place through 2015. FASITs that remained outstanding in accordance with their original terms on the effective date of the repeal were exempt from the repeal.

As part of the purported FASIT, A purchased all of the outstanding shares of a class of preferred stock issued by P for the sole purpose of representing a regular interest in the FASIT under I.R.C. § 860L(b)(1). P also issued a note to B to represent the ownership interest of the FASIT under I.R.C. § 860L(b)(2), and a note to C to represent another regular interest.

For each year that the purported FASIT was outstanding, B, as holder of the ownership interest in the FASIT, reported the income that P received on the FASIT assets, and, relying on I.R.C. § 860H(c)(1), deducted amounts representing the expenses of the FASIT and the dividends paid to A. After examination of P's returns for

the 2008 through 2011 taxable years, R disregarded the FASIT because the requirement that all of the interests in the FASIT be either the ownership interest or a regular interest was not met, and R allocated income generated by the FASIT assets in each year to P.

*Held*: The preferred stock was not a valid regular interest when the purported FASIT was implemented because it did not unconditionally entitle A to a specified principal amount.

*Held, further*, the preferred stock was not a valid regular interest when the purported FASIT was implemented because it did not entitle A to interest payments based on a fixed or permitted variable rate.

*Held, further*, regardless of whether the preferred stock was a valid regular interest at the time the FASIT was implemented, it would have ceased to be a valid regular interest in the latter half of 2000 and/or in 2003 because the dividends paid to A ceased to be based on a fixed or permitted variable rate at those times.

*Held, further*, P failed to meet the requirements of the grandfather clause that was enacted when I.R.C. §§ 860H through 860L were repealed in 2004.

*Held, further*, P's failure to strictly comply with statutory requirements cannot be excused by the substantial compliance doctrine because they were essential statutory requirements rather than procedural or directory regulatory requirements.

*Held, further*, P has failed to show that it was not the beneficial owner of the assets.

*Held, further*, P must recognize the interest income generated by the FASIT assets.

*Held, further*, the preferred stock was in substance equity, and therefore P is not entitled to business interest deductions in the amounts it paid to A as dividends for each year in issue.

---

*Rajiv Madan*, *Nathan Wacker*, *Melinda Gammello*, *Erin E. Girbach*, *Olumayowa S.O. Olujohungbe*, and *Kevin Stults*, for petitioner.

*Charles Buxbaum*, *Matthew Crouch*, *Andrew Michael Tiktin*, *Travis Vance*, and *Gretchen A. Kindel*, for respondent.

KERRIGAN, *Judge*: Respondent determined the following deficiencies in petitioner's federal income tax for its 2008–11 tax years (years in issue).

| *Tax Year* | *Deficiency* |
|---|---|
| 2008 | $10,469,002 |
| 2009 | 9,331,096 |
| 2010 | 9,338,611 |
| 2011 | 9,330,260 |

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for consideration are (1) whether the arrangement among petitioner, Sanofi-Aventis Amerique du Nord S.A. (SAAN), Dynamo Investments, Inc. (Dynamo), and Chase Manhattan Bank (Chase) qualified as a valid financial asset securitization investment trust (FASIT) under sections 860H to 860L (FASIT rules), (2) if the arrangement was not a FASIT, whether petitioner substantially complied with the requirements of the FASIT rules, (3) if the arrangement was not a FASIT, whether petitioner should be treated as the beneficial owner of the purported FASIT's assets, and (4) if the

arrangement was not a FASIT, whether the interest in the arrangement held by SAAN was debt or equity.[1]

## FINDINGS OF FACT

Petitioner is and was during the years in issue a Pennsylvania corporation and an indirect subsidiary of its French parent company, Sanofi, S.A. (Sanofi).[2] Sanofi and its subsidiaries are a multinational enterprise that specializes in the discovery, development, manufacture, and commercialization of prescription drugs. Petitioner is and was during the years in issue the common U.S. parent of an affiliated group of corporations that carry out Sanofi's North American operations. Petitioner filed consolidated federal income tax returns for each year in issue. Petitioner's principal place of business was New Jersey when it filed its Petition.

SAAN and Rhône-Poulenc Investissement, S.A. (RPI), were French affiliates of petitioner and were also indirect subsidiaries of Sanofi. On June 20, 2001, the shareholders of RPI approved a name change to Aventis Investissement S.A. (AI). SAAN was AI's parent company, and it dissolved AI without liquidation in 2006.[3]

From 2000 to 2011, relevant subsidiaries of petitioner include the Rorer Group Financial Co., Aventis Pharmaceuticals, Inc. (API), and Aventis Holdings, Inc. (AHI). Rhône-Poulenc Rorer International Holdings, Inc. (RPRIH) was a Delaware corporation and an indirect subsidiary of Sanofi. On December 31, 2001, RPRIH merged into Rhône-Poulenc Rorer, Inc. (RPR). Before June 20, 2002, petitioner was known as RPR.

### I. *Background of the Transaction*

Sanofi sought to expand its North American operations in the late 1990s and 2000s and needed liquid financing to accomplish this goal. Often, petitioner borrowed from its French parent Sanofi in the form of intercompany loans. As a result of growth in the United States, petitioner considered funding options, including a FASIT.

[1] Other adjustments in the Notice of Deficiency are computational.

[2] Before August 20, 2004, Sanofi was known as Rhône-Poulenc, Inc. Between August 20, 2004, and May 6, 2011, Sanofi was known as Sanofi-Aventis, S.A.

[3] Going forward we will refer to RPI and AI as SAAN.

In April 1999 Babcock & Brown, Inc. (Babcock & Brown),[4] an investment banking firm, presented petitioner with a proposal to use a FASIT to securitize certain intercompany loans. The creation of a FASIT would allow petitioner to meet its financing needs and obtain tax benefits on account of differing tax treatment between the United States and foreign jurisdictions.

FASITs were a statutorily created type of securitization. A securitization is a financial arrangement where a set of income- or cashflow-generating assets is pooled and repackaged into securities, denominated the ownership interest and regular interests, that are sold to different investors. Under the FASIT rules, valid regular interests of a FASIT were treated as debt.[5]

Babcock & Brown's original FASIT plan dated April 1999 proposed the use of a security labeled "preferred stock" to be sold to petitioner's French affiliate as a regular interest in a FASIT under the FASIT rules. Babcock & Brown claimed that dividends received on such preferred stock would be eligible for a "participation exemption" in European countries, including France and Germany, as well as deductible to the payor as interest payments on debt under the FASIT rules. Petitioner paid Babcock & Brown an upfront fee of $970,000 to implement the FASIT arrangement.

In December 1999 petitioner and BBH Capital, Inc. (BBH), an affiliate of Babcock & Brown, executed an Asset Management Agreement (1999 AMA) to govern the proposed FASIT. The terms of the 1999 AMA were never implemented, and the parties finalized the structure of the transaction at issue in the following year.

---

[4] Babcock & Brown converted from a corporation to a California limited partnership at some point between the 1999 FASIT proposal and June 12, 2000.

[5] Pursuant to section 860H(c)(1), a valid regular interest of a FASIT is generally treated as debt regardless of its form. *See infra* Opinion Part I.A.

II. *The 2000 FASIT Arrangement*

A. *FASIT Election and Initial Assets*

On July 21, 2000, the FASIT[6] was created when RPR,[7] SAAN, BBH, Chase, and Dynamo, a wholly owned subsidiary of Babcock & Brown that was created for the purpose of this transaction, entered into an Amended and Restated Asset Management Agreement (2000 AMA). The parties to the FASIT arrangement also entered into an Amended and Restated Note Purchase Agreement to govern the FASIT. In the 2000 AMA, BBH assigned its rights and obligations under the 1999 AMA to Dynamo and Chase and was effectively no longer a party to the FASIT.

Around this time a presentation was created on petitioner's letterhead explaining the arrangement. This document was entitled Approval of FASIT Transaction. The document provided background information on FASITs including their tax treatment. It specifically stated: "In computing net taxable income or loss of the FASIT, payments on these so-called regular interests are deductible regardless of the actual form of such regular interests."

This document used the term "preferred dividends" for the interest which became the Series A/E Stock. Additionally, the document explained that petitioner would treat the payment of preferred dividends as tax-deductible interest, and SAAN under French tax laws would treat the receipt of preferred dividends as nontaxable dividends. The approval presentation indicated that there would be savings of $12 million annually.

The 2000 AMA was only to be modified "by a written instrument evidencing such amendment and signed by each of the parties hereto." If the FASIT arrangement was valid, both SAAN and Chase would hold regular interests in the FASIT. Dynamo claimed it was the owner of the FASIT assets for U.S. federal income tax purposes, even though petitioner managed the FASIT assets and held legal title.

[6] We acknowledge that the Commissioner contends that the transaction did not qualify as a FASIT; and our use of the term to describe the transaction for the purpose of this Opinion is for clarity and does not have legal effect.

[7] Going forward we will refer to RPR as petitioner.

Petitioner designated a segregated pool of $571 million in intercompany loans on its books as the initial FASIT assets. These initial assets consisted of two debt instruments (short-term and long-term) that RPR (UK) Holdings, Ltd. (RPRUK), a subsidiary of Sanofi, issued together with certain associated currency and interest rate swaps to petitioner.

The short-term portion had a principal of £96 million and accrued interest at a variable rate equal to the current one-month London Interbank Offered Rate (LIBOR) plus 25 basis points (Initial Short-Term Loan). The Initial Short-Term Loan was repayable upon petitioner's demand, but no earlier than one year after the loan was executed.

The initial long-term portion had a principal of £545 million and accrued interest at a fixed rate of 6.85% (Initial Long-Term Loan). In 1998, £260 million of the Initial Long-Term Loan's principal was capitalized and its principal was £285 million as of 2000. The Initial Long-Term Loan matured on July 1, 2003.

The 2000 AMA limited the type of assets that the asset manager could choose as FASIT assets and referred to these assets as permitted assets. The 2000 AMA defined "permitted asset" as:

> a financial instrument[], . . . which in each case:
>
> (i) is denominated in United States dollars;
>
> (ii) has a fair market value (FMV) when acquired that is equal to the face amount thereof and otherwise does not include any "market discount" within the meaning of [s]ection 1278(a)(2), "original issue discount" within the meaning of [s]ection 1273(a)(1), or "bond premium" within the meaning of [s]ection 171(b);
>
> (iii) is (a) treated as a "variable rate debt instrument" and bears interest at a qualified floating rate within the meaning of Treasury Regulation section 1.1275-5(b) (including a synthetic debt instrument within the meaning of Treasury Regulation section 1.1275-6), (b) a fixed rate bank deposit, (c) shares in a money market fund within the meaning of Rule 2a-7 under the Investment

Company Act of 1940, as amended, or (d) a fixed rate debt instrument;

(iv) has a yield to maturity when acquired that is less than the Applicable Federal Rate in effect for the calendar month in which the asset is acquired by the Company plus 5 percentage points;

(v) matures as to principal and interest, or is redeemable at the option of the holder thereof at a redemption price equal to the principal amount thereof plus accrued interest thereon, on or prior to the last Business Day of the Initial Term or the then current Renewal Term [of the FASIT], as applicable; and

(vi) is not issued by [Dynamo or Chase] or any Affiliate of [Dynamo or Chase] . . . .

Both the short-term and long-term initial assets were permitted assets pursuant to the 2000 AMA and met the statutory definition of permitted assets in section 860L(c)(1).

Petitioner issued three FASIT interests to the FASIT investors, the returns on which were funded by the interest income generated by the FASIT assets. The three FASIT interests were:

Class I Note issued to Dynamo in exchange for $500,000, designated the ownership interest;[8]

Class II Note issued to Chase Bank in exchange for $11.5 million, designated a regular interest in the FASIT;[9] and

Series A/E Stock[10] issued to SAAN in exchange for $559,500,000, designated a regular interest in the FASIT.[11]

---

[8] The designation as an ownership interest does not mean that the statutory requirements have been met.

[9] The designation as a regular interest does not mean that the statutory requirements have been met.

[10] Our use of the term "stock" for the purpose of this Opinion is for clarity and does not have legal effect.

[11] The designation as a regular interest does not mean that the statutory requirements have been met.

When RPRIH merged into petitioner in 2001, petitioner had an unrelated class of outstanding preferred stock it identified as "Series A" preferred stock. To distinguish the FASIT-issued Series A Stock in RPRIH from petitioner's preexisting Series A shares, each share of the FASIT-issued Series A Stock in RPRIH was converted into a share of "Series E" stock of petitioner in the merger. For each year in issue, the stock remained outstanding as Series E Stock in petitioner. We refer to the 280 shares in petitioner that were issued as part of the transaction as "Series A/E Stock."




Dynamo filed a FASIT election with its Form 1120, U.S. Corporation Income Tax Return, for its taxable year ending March 31, 2001, to treat the FASIT arrangement as a FASIT for U.S. federal income tax purposes, on July 21, 2000. Dynamo was an eligible corporation as defined in section 860L(a)(2). The FASIT election identified each of the Initial Loans and a money market account as the initial FASIT assets. The initial FASIT assets had an aggregate principal amount of $571,500,000. Petitioner did not have any collateral securing either of the Initial Loans.

B. *Securities Issued to Interest Holders*

The income generated by the FASIT assets was distributed annually to the Class I Noteholder, the Class II Noteholder, and the Series A/E Stockholder on December 31 of each year. First, the income from the FASIT was used to pay the asset manager's fee. Second, the income was used to pay the interest due to the Class I and Class II Noteholders on their respective returns. Third, the remaining income was eligible to be distributed as dividends to the Series A/E Stockholder.

The Class I Noteholder and the Class II Noteholder were both entitled to receive FASIT Rate Interest and Supplemental Interest each year. FASIT Rate Interest and Supplemental Interest were calculated daily. FASIT Rate Interest was calculated as the principal amount of the Class I or Class II Note multiplied by the "FASIT Rate." The FASIT Rate for each day was defined as the amount of interest accrued on that day by the underlying FASIT assets, less the asset manager's fee, and any guaranty fee, divided by the principal amount of the FASIT assets. Supplemental Interest entitled the Class I and II Noteholders to yearly interest at a rate of 1.5522% of the principal amount of the respective Note.

As included in the 2000 AMA and in the Class I Note, Dynamo as the Class I Noteholder was entitled to Additional Interest, which was an amount equal to the excess, if any, of (1) the total amount of income (other than gain) earned on the FASIT assets during such Accrual Period, less (2) the sum of (i) the amount of FASIT Rate Interest and Supplemental Interest due under this Note in respect of such Accrual Period, (ii) the amount of FASIT Rate Interest and Supplemental Interest (as defined in the Class II Note of the Company) due under the Class II Note of the Company in respect of such Accrual period, and (iii) the sum of the amounts for each day during such Accrual Period equal to (a) the FASIT Rate for each such day minus 0.00033291153 divided by (y) 365 or 366 as appropriate multiplied by (b) the Adjusted Issue Price of the Series A/E Stock.

Under the 2000 AMA any gain realized from a FASIT asset during an accrual period would be allocated to the Class I Note. All determinations of income, gain, loss, or deduction under the transaction documents were to be made under U.S. federal income tax principles except where otherwise indicated.

The Additional Interest formula was structured to reflect the FASIT Rate Interest and Supplemental Interest paid to the Class I Noteholder and the Class II Noteholder on the principal amount of $12 million. The Additional Interest formula was designed to compute to zero, meaning after distribution of the FASIT Rate Interest and Supplemental Interest, no residual income should have remained from the FASIT assets to be allocated as Additional Interest. From 2000 through 2011 petitioner calculated the Additional Interest due to Dynamo to be zero.

The terms of the Series A/E Stock were set forth in a Certificate of Voting Powers, Designations, Preferences, and Restriction (Stock Certificate). As holder of the Series A/E Stock, SAAN was entitled to one vote per share on all corporate matters and voted with the holders of petitioner's common stock. SAAN was also entitled to elect one director of petitioner's board of directors. Petitioner labeled the Series A/E Stock as preferred stock with signatures from two of its officers. Additionally, petitioner treated the Series A/E Stock as preferred stock for book accounting purposes.

If the Series A/E Stock was treated as equity for French tax purposes, SAAN was entitled to a "participation exemption" for dividends on such stock and did not pay tax on the amount exempted. Dividends were payable on the Series A/E Stock at the discretion of petitioner's board of directors. The undistributed profits available for payment on the Series A/E Stock were the earnings on the FASIT assets less payments of interest due to the Class I Note and the Class II Note, the asset manager's fee, any guaranty fee, and any other expense of the FASIT. Dividends were cumulative, meaning that for each accrual period, the Series A/E Stockholder accrued the right to receive the FASIT's distributable profits for that accrual period regardless of whether the distributable profits were actually paid out as dividends. Payments on the Series A/E Stock could not be made from petitioner's general corporate assets.

Petitioner's board of directors declared dividends on the Series A/E Stock each year from 2000 to 2011, except 2001, in the following amounts:

| *Year* | *Dividend Amount* |
|---|---|
| 2000 | $16,342,405 |
| 2002 | 11,314,602 |
| 2003 | 11,997,891 |
| 2004 | 23,673,649 |
| 2005 | 27,814,151 |
| 2006 | 30,019,360 |
| 2007 | 29,999,009 |
| 2008 | 29,904,535 |
| 2009 | 29,615,679 |
| 2010 | 29,639,535 |
| 2011 | 29,613,027 |

The Stock Certificate included a provision addressing the redemption of the Series A/E Stock upon termination of the FASIT. The Series A/E Stock was to be redeemed at a price equal to the fair market value (FMV) of the FASIT assets less the amounts due on the Notes, and any other accrued and unpaid expenses of the FASIT, referred to as a "liquidation preference."

C. *The Money Market Account*

The FASIT assets paid interest semiannually. Each year, during the interim period between the interest payment on the FASIT assets to petitioner and the yearend payment petitioner made to the FASIT investors, the interest was deposited and held in a money market account. This enabled the funds to earn interest before payment to the FASIT investors. The money market account represented a temporary investment of earnings of the FASIT arrangement pending distribution. The interest from the money market account was included in FASIT earnings. Dynamo reported the earnings from the money market account as dividend income.

From 2000 to 2011, petitioner advised that the money market account earned dividend income as follows:

| *Year* | *Dividend Income* |
|---|---:|
| 2000 | $206,981 |
| 2001 | 474,087 |
| 2002 | 94,804 |
| 2003 | 43,022 |
| 2004 | 98,070 |
| 2005 | 260,392 |
| 2006 | 395,921 |
| 2007 | 398,806 |
| 2008 | 223,200 |
| 2009 | 15,408 |
| 2010 | 39,268 |
| 2011 | 12,756 |

D. *Asset Manager*

Pursuant to the 2000 AMA and the 2003 AMA,[12] RPRIH and then petitioner were appointed the asset manager of the FASIT assets. The asset manager received annual compensation equal to 0.005% of the FASIT amount, computed daily. The FASIT amount was defined as the aggregate principal amount of the Class I and II Notes and the aggregate adjusted issue price of the Series A/E Stock as of any date. In its capacity as asset manager, petitioner was able to guarantee the FASIT assets in exchange for an additional fee "to be determined by [petitioner] in accordance with customary commercial practices." No guaranty fees were paid in conjunction with the FASIT arrangement.

There was no separate FASIT entity. At all times the FASIT existed as a segregated pool of assets on petitioner's balance sheet.

[12] The AMA was updated in 2003 and is addressed *infra* Findings of Fact Part III.

Petitioner was subject to various restrictions with regard to the FASIT assets.

Petitioner, as asset manager of the FASIT arrangement, was required under the AMA to hold the FASIT assets until maturity or redemption. Additionally, petitioner was authorized to replace any FASIT asset with any other permitted asset of equal principal amount so long as the replacement did not result in the realization of gain or loss to any person for U.S. federal income tax purposes, and provided that the aggregate principal amount of the FASIT assets was at all times equal to the FASIT amount. The 2000 AMA prohibited petitioner from (1) pledging, granting a security interest, assigning as a security, or otherwise encumbering the FASIT assets; (2) issuing any additional debt securities on parity with or senior to the Class I and II Notes; or (3) applying any income received from the FASIT assets in a manner other than as specified in the 2000 AMA.

Section 5 of the 2000 AMA specified how petitioner was to apply income generated from the FASIT assets. At the end of each year, petitioner was required to apply FASIT earnings in the following order: (1) to payment of the asset manager's fee, (2) to payment of any guaranty fee and any other expenses of the FASIT, (3) to payments made on the Class I Note and the Class II Note, and (4) to the extent petitioner's board of directors declared dividends, to payment on the Series A/E Stock.

In accordance with the AMA, petitioner was required to invest FASIT earnings not distributed at yearend into additional permitted assets which would then be considered FASIT assets. Any gain realized in respect of FASIT assets was to be allocated to the Class I Note and any loss in respect of FASIT assets was to be allocated to the Series A/E Stock. No valuation study was ever done to determine the FMV of the FASIT assets.

## III. *2003 and 2005 Changes to the FASIT*

On September 30, 2003, petitioner acknowledged receipt of £289,867,553 from RPRUK as payment in full satisfaction of the Initial Long-Term Loan. With part of the proceeds, petitioner acquired a new FASIT asset—a promissory note reflecting a loan from AHI to API, each a subsidiary of petitioner, with a principal amount of $415,600,000 that accrued interest at a fixed rate of 5.02% per year (2003 Loan). The 2003 Loan matured on December 29, 2012. The 2003 Loan was secured by

certain of API's receivables pursuant to a security agreement. The covered amount in the security agreement equaled 110% of the principal amount of the 2003 loan. The 2003 Loan met both the 2000 AMA requirements and the statutory requirements for a permitted asset.

With the remaining funds petitioner repaid $400,000 of the $500,000 principal outstanding on the Class I Note and redeemed the Class II Note in full. At the outset of the FASIT arrangement, Chase lent Dynamo $400,000 of the $500,000 purchase price of the Class I Note. Dynamo used the proceeds from the partial redemption of the Class I Note to satisfy its obligation to Chase. Upon redemption of the Class II Note, Chase withdrew from the FASIT entirely.

To reflect Chase's withdrawal and the accompanying changes to the FASIT assets, a Second Amended and Restated Asset Management Agreement (2003 AMA) and a Second Amended and Restated Note Purchase Agreement were executed on September 30, 2003. The 2000 and 2003 AMAs were generally the same, except for the absence of Chase. The terms of the Series A/E Stock were not amended and none of the stock was redeemed as a result of the 2003 changes to the FASIT.

From 2000 through September 30, 2003, when Chase withdrew from the FASIT arrangement, the Class I Noteholder never received Additional Interest. After Chase's withdrawal, the Class I Note was revised to reflect the reduction in principal from $500,000 to $100,000. The Class I Note's Additional Interest provision was not updated to reflect the reduction of third-party investment to $100,000.

Before and after the 2003 AMA was in effect, Dynamo was entitled to Additional Interest equal to FASIT income less the sum of (1) FASIT Rate Interest due on the Note(s), (2) Supplemental Interest due on the Note(s), and (3) the FASIT Rate minus 0.00033291153 multiplied by the adjusted issue price of the Series A/E Stock. After the changes to the FASIT assets in 2003, petitioner continued to calculate the Additional Interest due to Dynamo as zero.

On July 1, 2005, the remaining initial asset, RPRUK's Short-Term Loan of £102,914,946 ($144 million), was repaid. Petitioner used the proceeds from the repayment of the Initial Short-Term Loan to purchase an additional account receivable from AHI to API in the amount of $144 million (2005 Loan) that matured on March 31, 2015. Consequently, as of July 1, 2005, the FASIT held two intercompany receivables due from API. The 2005 Loan accrued interest annually at

a fixed rate of 5.81%. The 2005 Loan met the definition of a permitted asset as defined in the 2000 AMA and the statutory requirements of a permitted asset. By a separate security agreement, API's receivables similarly secured up to 110% of the principal amount of the 2005 Loan.

IV. *2005 Renewal and Subsequent Renewals of the FASIT*

Under the terms of the 2000 and 2003 AMAs, the FASIT was set to terminate on January 15, 2005, unless the parties to the FASIT arrangement mutually agreed to extend the arrangement for another five-year term. The FASIT arrangement could be extended in five-year increments with the total term not to exceed 30 years. Each party was required to notify the other parties in writing of its intention to extend the FASIT by October 15 of the year before the end of each term. By letter agreement dated January 14, 2005, the parties mutually agreed to extend the FASIT for a second five-year term ending January 15, 2010. None of the parties provided renewal notice in accordance with the 2003 AMA by October 15 of the year before termination (2004). Instead the parties agreed to waive the 90-day notice requirement in the letter agreement dated January 14, 2005.

Leading up to the 2010 renewal of the FASIT, Babcock & Brown became insolvent. To ensure Dynamo's financial wellbeing through a third five-year term, petitioner sought to have Dynamo sold to a third party.

On January 15, 2010—the same day petitioner, SAAN, and Dynamo agreed to renew the FASIT for its third five-year term—petitioner's affiliate Sanofi-Aventis, U.S., Inc., entered into an agreement with Babcock & Brown (put option agreement). The put option agreement granted Babcock & Brown an option to sell all of the Dynamo shares to Sanofi-Aventis, U.S., Inc. subject to certain conditions. The put option agreement granted Sanofi-Aventis, U.S., Inc. and API the right to designate any other entity described by petitioner's officers as a "friendly" partner, as purchaser of the Dynamo shares under the agreement. Petitioner paid Babcock & Brown $2,275,000 in exchange for renewing the FASIT and the rights granted in the put option agreement. Around July 2010 Chase acquired Dynamo.

V. *Termination of the FASIT*

The parties to the FASIT arrangement did not extend it in 2015 for a fourth five-year term. Instead of extension, the parties adopted a plan of liquidation to unwind the FASIT effective January 15, 2015. The

FASIT arrangement terminated in April 2015. Under the plan of liquidation, petitioner was required, within 90 days, to liquidate the FASIT assets, pay the expenses of the FASIT, and use the remaining proceeds to redeem the Class I Note and the Series A/E Stock. The redemption price of the Series A/E Stock was equal to the aggregate "liquidation preference" as of such date.

VI. *Tax Reporting and Determination of Deficiency*

Under the 2000 and 2003 AMAs, petitioner was required to treat Dynamo as the owner of the FASIT assets for U.S. tax purposes. Accordingly, Dynamo included on its federal income tax returns the income received on the FASIT assets and deducted payments made on the Class II Note while it was outstanding, dividends paid on the Series A/E Stock, and the asset manager's fee. For years 2008 through 2010 Dynamo reported earnings from the money market account as dividend income on its tax returns. For years 2010 through 2012, after Chase acquired Dynamo, Chase reported Dynamo's interest income on the Class I Note and the FASIT's income and expenses as part of its consolidated group.

Petitioner filed consolidated Forms 1120 for each year in issue. Petitioner reported the Series A/E Stock as "preferred stock" on its Schedule L, Balance Sheets per Books, for each year in issue. On the Schedules M–2, Analysis of Unappropriated Retained Earnings per Books, attached to its Forms 1120 for each year in issue, petitioner reported various amounts of "Other decreases." Part of the "Other decreases" for each year was a "FASIT Asset Retained Earnings Adjustment" in the following amounts: $29,901,427, $29,617,411, $29,637,801, and $29,614,577 for 2008, 2009, 2010, and 2011, respectively. These numbers reflect amounts received as interest on FASIT assets and as payments due on the Class I Note and dividends declared on the Series A/E Stock.

After examination respondent disregarded Dynamo's FASIT election and designation as owner of the FASIT assets for tax purposes. Respondent allocated the income generated by the FASIT assets less the interest paid to Dynamo, asset manager's fees, and FASIT expenses to petitioner.

VII. *Summary of Expert Witnesses*

Various witnesses gave testimony relevant to the FASIT arrangement and to the substantive terms of the Series A/E Stock.

Among those witnesses were the following experts, whose reports will be discussed further throughout this Opinion.

A. *Petitioner's Expert, Michael Cragg*

Petitioner offered expert testimony from Michael Cragg, a senior partner at a global economic consulting firm with a Ph.D. in economics. Dr. Cragg has over 25 years of experience analyzing financial markets and the public financial services sector for the purposes of research, advising, and testifying. Dr. Cragg concluded that the Series A/E Stock was more similar to debt than to equity and that the FASIT arrangement did not cause an economic loss to the U.S. Treasury.

B. *Respondent's Experts*

1. *Evan Cohen*

Respondent offered expert testimony from Evan Cohen, the principal and chairman of an economic consulting firm based in Boston, Massachusetts. Mr. Cohen has a master's degree in business administration with a concentration in financial engineering. He received his Chartered Financial Analyst designation from the Chartered Financial Analyst Institute in 2013. Mr. Cohen has over 25 years of experience in capital structure, corporate finance, and economics.

Mr. Cohen's opinion concluded from a financial and economic perspective that petitioner did not make an economic commitment to return a predictable, pre-specified amount of capital to the Series A/E Stockholder. He also concluded that petitioner did not make an economic commitment to make predictable, pre-specified dividend payments to the Series A/E Stockholder and that petitioner's commitment to make dividend payments was not consistent with debt instruments. Additionally, he concluded that there was not sufficient information for the Series A/E Stockholder to assess the risk of the Series A/E Stock while the instrument was outstanding.

2. *Nasser Ahmad*

Respondent offered expert testimony from Nasser Ahmad, the managing partner and chief investment officer of an asset management firm based in New York, NY. Mr. Ahmad has a master's degree in electrical engineering and computer science and has acquired over 30 years of experience in the financial services industry since completing

his education. In particular, Mr. Ahmad has extensive experience analyzing and trading fixed income securities, structured and securitized debt, and public and private equity.

Mr. Ahmad concluded that the Series A/E Stock was structured as equity, with characteristics that align with typical equity features. Additionally, he concluded that market participants acting in an arm's-length manner would have recognized and treated the Series A/E Stock as equity. His testimony also addressed the allocation of cashflows pertaining to the money market account following Chase's withdrawal from the arrangement and whether this allocation would be expected in an arm's-length transaction.

## OPINION

We must first decide whether the FASIT arrangement was a valid FASIT pursuant to the statutory requirements. If the FASIT was not valid, we consider the following: (1) whether there was substantial compliance, (2) whether petitioner was the beneficial owner of the FASIT assets, and (3) whether the Series A/E Stock should be treated as debt for federal income tax purposes. Petitioner contends that the FASIT arrangement was valid for the years in issue. In contrast respondent contends that the FASIT arrangement was invalid from its inception in 2000.

Respondent determined that petitioner was required to recognize interest income on the assets identified in the FASIT arrangement for the years in issue. Generally, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioner does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

Respondent in support of his argument that the FASIT arrangement was not a valid arrangement offered Exhibit 314-R, Revenue Agent Lynch's notes from her interview with Clifford Losh held on October 24, 2013. At trial Exhibit 314-R was admitted as a business record. Ruling on whether the notes can be admitted as nonhearsay was reserved. Both Ms. Lynch and Mr. Losh testified during the trial. The issue of whether the document is an exception to hearsay does not need to be decided as the notes are not relevant. Accordingly, Exhibit 314-R is not admitted for any additional purpose. *See* Fed. R. Evid. 403.

I. *Overview of FASITs*

Statutorily created FASITs were a type of securitization, which is the process of pooling assets into a fund or entity and selling securities backed by the specified pool of assets. Generally, income generated by the securitized assets funded interest and principal payments made to the holders of the securities.

A. *The FASIT Rules*

The FASIT rules were enacted pursuant to section 1621(a) of the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755, 1858. The purpose of the statutorily created FASIT was to permit the securitization of pools of nonmortgage debt obligations held by financial institutions in order to

> spread the risk of credit on the debt to others. The [Senate Finance] Committee believe[d] that the spreading of credit risk will lessen the concentration of such risk in banks and other financial intermediaries which, in turn, will lessen the pressure on Federal deposit insurance. Further, the Committee believe[d] that the spreading of credit risk through securitization will result in lower interest rates for consumers.

S. Rep. No. 104-281, at 126 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1474, 1600.

The FASIT rules of section 860L(a)(1) set forth five statutory requirements for FASIT qualification:

> (1) In general.—For purposes of this title, the terms "financial asset securitization investment trust" and "FASIT" mean any entity—
>
> (A) for which an election to be treated as a FASIT applies for the taxable year,
>
> (B) all of the interests in which are regular interests or the ownership interest,
>
> (C) which has only one ownership interest and such ownership interest is held directly by an eligible corporation,
>
> (D) as of the close of the third month beginning after the day of its formation and at all times thereafter, substantially all of the assets of

> which (including assets treated as held by the entity under section 860I(b)(2)) consist of permitted assets, and
>
> (E) which is not [a regulated investment company] described in section 851(a).

Subject to exceptions not relevant here, domestic subchapter C corporations were "eligible corporations" that could hold the ownership interest of a FASIT. § 860L(a)(2). Section 860L(c)(1) defines permitted assets as:

> (1) In general.—The term 'permitted asset' means—
>
> (A) cash or cash equivalents,
>
> (B) any debt instrument (as defined in section 1275(a)(1)) under which interest payments (or other similar amounts), if any, at or before maturity meet the requirements applicable under clause (i) or (ii) of section 860G(a)(1)(B),
>
> (C) foreclosure property,
>
> (D) any asset—
>
> (i) which is an interest rate or foreign currency notional principal contract, letter of credit, insurance, guarantee against payment defaults, or other similar instrument permitted by the Secretary, and
>
> (ii) which is reasonably required to guarantee or hedge against the FASIT's risks associated with being the obligor on interests issued by the FASIT,
>
> (E) contract rights to acquire debt instruments described in subparagraph (B) or assets described in subparagraph (D),
>
> (F) any regular interest in another FASIT, and
>
> (G) any regular interest in a REMIC.

When considered together, the FASIT rules' requirements demonstrate that FASITs were a method of securitization intended to pass the economic exposure to underlying debt instruments through the FASIT entity to investors. In accordance with this objective, a valid regular interest in a FASIT is treated as debt for federal income tax purposes regardless of how it would be classified by other standards of law. § 860H(c)(1).

B. *Repeal of the FASIT Rules*

The FASIT rules were repealed by section 835(a) of the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, 118 Stat. 1418, 1593. The House Committee on Ways and Means stated that "FASITs are not being used widely in the manner envisioned by the Congress" as a reason for the repeal. H.R. Rep. No. 108-548, pt. 1, at 291 (2004). Specifically, the Committee noted that FASITs are "particularly prone to abuse and are likely being used primarily to facilitate tax avoidance transactions" and further stated that the Committee was aware that FASITs were being used "to facilitate the issuance of certain tax-advantaged cross-border hybrid instruments that are treated as indebtedness in the United States but equity in the foreign country of the holder of the instruments" and that was not the intention when Congress enacted the FASIT rules. *Id.* at 291 & n.325.

The repeal of the FASIT rules was effective January 1, 2005, except for those FASITs "in existence on [October 22, 2004] to the extent that regular interests issued by the FASIT before such date continue to remain outstanding in accordance with the original terms of issuance." AJCA § 835(c) (grandfather provision), 118 Stat. at 1594. For the FASIT arrangement to be valid for the years in issue, the arrangement must be valid, at all times, from its inception and at all times before 2008, which includes meeting the requirements of the grandfather provision.

II. *Analysis of FASIT Arrangement Validity*

In the Notice of Deficiency, respondent determined that the FASIT arrangement was not a valid FASIT at all times before the effective date of the grandfather provision, for two reasons. First, respondent argues that the Series A/E Stock did not meet the requirements of a valid regular interest of a FASIT at three specific times: (1) from inception, (2) in the latter half of 2000 because of the allocation of income earned by the money market account, and (3) in the latter half of 2003 because of Chase's withdrawal from the arrangement. Second, respondent argues that when the parties altered the terms of the FASIT when they renewed the FASIT by letter agreement on January 14, 2005, the extension had no effect because the FASIT had terminated on its own.

### A. *The Series A/E Stock Was Not a Valid Regular Interest from the Arrangement's Inception.*

A valid FASIT must meet five statutory requirements. *See* § 860L(a)(1). The FASIT arrangement at issue failed to meet the requirement that all interests were regular interests or the ownership interest.

#### 1. *Requirements of a Regular Interest in a FASIT*

A regular interest in a FASIT was any interest issued by the FASIT on or after the startup date that was designated a regular interest, had fixed terms, and satisfied the following five requirements:

> (i) such interest unconditionally entitles the holder to receive a specified principal amount (or other similar amount),
>
> (ii) interest payments (or other similar amounts), if any, with respect to such interest are determined based on a fixed rate, or, except as otherwise provided by the Secretary, at a variable rate permitted under section 860G(a)(1)(B)(i),
>
> (iii) such interest does not have a stated maturity (including options to renew) greater than 30 years (or such longer period as may be permitted by regulations),
>
> (iv) the issue price of such interest does not exceed 125 percent of its stated principal amount, and
>
> (v) the yield to maturity on such interest is less than the sum determined under section 163(i)(1)(B) with respect to such interest.

§ 860L(b)(1)(A).

With respect to the Series A/E Stock's classification as a regular interest, respondent challenges its satisfaction of the first two requirements: (i) such interest unconditionally entitles the holder to receive a specified principal amount (or other similar amount), and (ii) interest payments (or other similar amounts), if any, with respect to the

stock were based on a fixed rate, or, except as otherwise provided by the Secretary, at a variable rate permitted under section 860G(a)(1)(B)(i).[13]

### 2. *Lack of an Unconditional Return of a Prespecified Principal Amount on Series A/E Stock*

The Series A/E Stock had no principal amount, and its terms were described by the Stock Certificate instead of a note purchase agreement or a promissory note. The Stock Certificate provided that the Series A/E Stock's original issue price was $1,998,214 per share. To satisfy the requirement that a regular interest unconditionally return a pre-specified principal amount under section 860L(b)(1)(A)(i), the Series A/E Stock should have unconditionally entitled SAAN to receive $1,998,214 per share or a specified amount upon redemption or liquidation of the FASIT.

Respondent argues that the liquidation preference did not entitle the Series A/E Stockholder to any specified amount and therefore did not satisfy the return of principal requirement. Petitioner argues the liquidation preference was structured in a manner that entitled the Series A/E Stockholder to receive the original issue price of $1,998,214, or $559,500,000 in total, upon liquidation or redemption of the stock under any circumstance. We agree with respondent.

The Series A/E Stock entitled its holder to receive upon liquidation or redemption of the stock an amount limited to the liquidation preference. The Series A/E Stock's liquidation preference was contingent on both the FMV of the FASIT assets at the time of liquidation and the fees and expenses incurred in managing the FASIT assets. Respondent's expert Mr. Ahmad explained that the liquidation preference effectively subordinated the payments due to the Series A/E Stockholder upon liquidation to those payments due to the Class I and II Noteholders. According to his report the Series A/E Stockholder was the "last in line" to get paid because there was no other investor in this securitization that was subordinate to the Series A/E Stockholder. The Series A/E Stockholder would receive the balance after all other claims are made.

[13] Section 860G and the accompanying regulations provide rules applicable to Real Estate Mortgage Investment Conduits (REMICs), another type of securitization of debt obligations. As is the case here, the FASIT rules incorporated by reference many rules applicable to REMICs.

The FASIT arrangement did not provide the Series A/E Stock with a specified principal or similar amount because the liquidation preference was tied to the FMV of the FASIT assets. The FMV of an asset is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551 (1973). The liquidation preference directly correlated with the FMV of the FASIT assets because the Series A/E Stock was entitled only to payment from the FASIT assets and not petitioner's general assets.

Respondent relied upon the expert testimony of Mr. Cohen to explain why the FMV of the FASIT assets could vary over time, meaning the liquidation preference could vary. Fixed rate debt instruments can vary over their life, as the fixed rate of return becomes more or less favorable relative to other available instruments. This results in the FMV of fixed rate assets varying with changes in market rates.

Mr. Cohen further explained that petitioner did not take steps to protect the Series A/E Stockholder from FMV variation. To be consistent with the AMAs petitioner should have managed the FASIT assets to ensure that they would mature at the time of redemption. Petitioner included assets in the FASIT pool that were not set to expire at the end of the current term of the FASIT.

Mr. Cohen also explained that the Series A/E Stockholder bore the risk of FMV variations caused by the issuer's change in credit risk. If the financial condition of a borrower declines, the risk of default increases and the FMV of the debt also declines. The inverse is also true and the FMV of the debt increases if the financial condition of the borrower improves.

According to Mr. Cohen, if FASIT assets were liquidated before the end of the AMA or if they were not scheduled to mature before the end of the current five-year term, the FMV of the FASIT assets would vary with changes in the underlying issuer's credit quality. The Series A/E Stockolder bore this risk that more or less than the full capital contribution of the Series A/E Stock could be returned.

Security agreements mitigated the credit risk the FASIT was exposed to with respect to the 2003 and 2005 Loans. Rather than repayment of the loans depending on API's creditworthiness, the security agreements merely shifted the FASIT's risk to that of the ability

of API's creditors to fulfill the receivables. Therefore, the FASIT was at all times subject to some level of credit risk that could have negatively affected the FMV of the FASIT assets.

Further, variation of the expenses of the FASIT could have negatively affected the value of the liquidation preference. One potential expense was petitioner's option to guarantee the value of the FASIT assets. The AMAs gave petitioner discretion to, at any time, provide a guaranty on the value of the FASIT assets in exchange for a periodic guaranty fee at a rate "to be determined by [petitioner] in accordance with customary commercial practices." Even though petitioner never offered a guaranty on the value of the FASIT assets, its option to do so throughout the tenure of the FASIT at an unspecified rate could have negatively affected the value of the liquidation preference. This effect could have resulted in the Series A/E Stockholder's receiving less at liquidation than expected at the outset of the transaction.

If the FMV of the FASIT assets had declined below the aggregate original issue price of the Series A/E Stock at the time of calculation of the liquidation preference, petitioner was not obligated to pay the lost value to the Series A/E Stockholder. Consequently, the Series A/E Stockholder would bear any reduction in the FMV of the FASIT asset or increase in FASIT expenses. The liquidation preference therefore could not have unconditionally entitled the Series A/E Stockholder to receive the original issue price of $1,998,214 per share or a specified amount.

3. *Whether the Series A/E Stock Entitled Its Holder to Payments Based on a Fixed Rate, or a Permitted Variable Rate, Such as a Weighted Average Rate*

The Series A/E Stock failed to comply with the FASIT rules' requirements governing periodic payments to its regular interest holders. §§ 860L(b)(1)(A)(ii), 860G(a)(1)(B)(i). Treasury Regulation § 1.860G-1(a)(3)(i) and (ii) provides that a permissible variable rate includes a rate based on a current interest rate (a qualified floating interest rate) or a weighted average rate. An interest rate is a qualified floating rate "if variations in the value of the rate can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds in the currency in which the debt instrument is denominated." Treas. Reg. § 1.1275-5(b)(1). A rate that correlates with a benchmark interest rate, such as the federal funds rate or LIBOR, is considered a qualified floating rate and thus a permitted variable rate.

The regulations clarify that certain modifications to floating interest rates are permissible; relevantly: "A rate is a variable rate if it is— . . . (B) [e]xpressed as a constant number of basis points more or less than a rate described in [Treas. Reg. § 1.860G-1(a)(3)(i) or (ii)] . . . ." Treas. Reg. § 1.860G-1(a)(3)(iii)(B).

A variable rate could be a qualified floating rate or a rate based on a weighted average of the interest rates on some or all of the assets held by the FASIT. *Id.* subpara. (3). A weighted average interest rate is generally "a rate that, if applied to the aggregate outstanding principal balance of a pool of mortgage loans for an accrual period, produces an amount of interest that equals the sum of the interest payable on the pooled loans for that accrual period." *Id.* subdiv. (ii). "[A]n interest rate is considered to be based on a weighted average rate even if, in determining that rate, the interest rate on some or all of the qualified mortgages is first subject to a cap or a floor, or is first reduced by a number of basis points or a fixed percentage." *Id.* subdiv. (ii)(B).

The maximum amount payable to the Series A/E Stockholder was the FASIT earnings less interest paid on the Class I and Class II Notes and accrued expenses. The dividend of the Series A/E Stock could vary depending on whether the FASIT decided to pay the appropriate interest, including Additional Interest due to the Noteholders.

The Stock Certificate did not include provisions that would require payments based on a weighted rate or any other rate to the Series A/E Stockholder. Instead, the Stock Certificate authorized petitioner's board of directors to declare dividends on the stock at its discretion and subject to the terms set forth in the Stock Certificate. The amounts of such dividends were not calculated using a fixed rate. Dividends were cumulative, meaning that if petitioner's board did not declare a dividend on the Series A/E Stock for a given year, the Series A/E Stockholder still became entitled to the FASIT's distributable profits for that year. The Series A/E Stockholder was not entitled to payment of any specified amounts.

Petitioner argues that the lack of a specified rate is not detrimental because the liquidation preference was structured to ensure that throughout the life of the FASIT, the Series A/E Stockholder would effectively receive interest payments determined by the FASIT Rate minus 3.3 basis points, which it argues is a weighted average rate. This argument relies on the premise that any distributable profits of the FASIT that were not distributed increased the liquidation preference of

the stock because such unpaid dividends were required to be reinvested into a FASIT asset. Petitioner contends that even with dividends on the Series A/E Stock being at the discretion of petitioner's board of directors, the Series A/E Stockholder would receive a weighted average rate over the life of the FASIT by virtue of any dividends actually paid plus the liquidation preference.

Petitioner's argument fails because both the timing and the amounts of dividends were ultimately at the discretion of petitioner's board of directors. The Series A/E Stockholder had no mechanism to enforce declaration of a dividend. Accordingly, the Series A/E Stock does not meet the requirements for a regular interest under section 860L(b)(1)(A)(ii).

4. *Conclusion*

The Series A/E Stock did not satisfy the following two requirements of a regular interest, that it (i) entitled the holder to a specified principal amount or other similar amount upon termination and (ii) entitled the holder to payments on a fixed rate per a permitted variable rate. Accordingly, the FASIT arrangement was not a valid FASIT from its inception. *See* § 860L(a)(1)(B).

B. *Other Instances Also Resulted in the Arrangement's Not Being a FASIT.*

As discussed above, we concluded that the arrangement was not a valid FASIT from its inception. Even if we concluded the opposite, several instances resulted in the arrangement's no longer being a FASIT. Respondent contends that the following resulted in the arrangement's not being a valid FASIT: (1) when in the latter half of 2000 the Series A/E Stockholder received interest generated from a money market account exceeding a weighted interest rate; (2) when, after Chase's withdrawal from the arrangement in 2003, petitioner paid funds to SAAN that should have been paid to Dynamo; and (3) when the parties changed the terms of the FASIT.

1. *Effect of Money Market Income on the Series A/E Stock's Status as a Regular Interest*

Beginning in the latter half of 2000 and continuing throughout the life of the arrangement, petitioner invested income earned on the FASIT assets in a money market account. The investment in the money market account increased the FASIT income, resulting in an increase of

the principal amount of FASIT assets, increasing the Additional Interest owed to Dynamo.

Petitioner identified the money market account as a FASIT asset, and treated the income generated by it as FASIT income. Petitioner, however, did not treat the amounts deposited into the money market account as increasing the principal of the FASIT assets for the purpose of determining FASIT Rate Interest.

Petitioner contends that the money market account was a separate mechanism to keep the deposited funds generating income before they were paid out to FASIT investors and that the money market account was not intended to be considered a FASIT asset for the purpose of calculating Additional Interest. Additionally, petitioner argues that even if the funds deposited into the money market account increase the principal amount of the FASIT, its pro rata payment of the money market interest was consistent with the permitted variable rate requirement.

The 2000 and 2003 AMAs did not explicitly address how income from the money market account would be treated by the FASIT; however, they provided guidance. Under the terms of the 2000 and 2003 AMAs, the FASIT Rate was determined in order to calculate the Additional Interest. The FASIT Rate was calculated using FASIT income net of fees in the numerator and the principal amount of the FASIT assets as the denominator. As the denominator figure increases, the resulting FASIT Rate decreases. For example, if two pools of assets produce the same amount of income, the pool with the higher principal amount of underlying assets boasts a lower rate of return.

Respondent's expert Mr. Ahmad explained that petitioner intended that Additional Interest always equal zero. Because FASIT Rate Interest due to the Noteholders was a function of the asset manager's fee and other FASIT expenses, Additional Interest calculations were a function of each of those items. The 0.00033291153 number in the third step of calculating Additional Interest was used with the intent that Additional Interest would always be zero. This calculation was true as long as (1) the aggregate principal of FASIT assets was equal to the aggregate principal of the Class I Note, Class II Note, and Series A/E Stock and (2) Supplemental Interest for the year was equal to $186,264, which is the amount of Supplemental Interest calculated assuming $12 million of principal on the Class I and Class II Notes.

Petitioner contends that the money market account income was incorporated into the FASIT Rate as a means of distributing the yield on each interest holder's interest in the FASIT arrangement. Respondent's expert Mr. Ahmad explained that there were three possible scenarios for how the money market income was allocated. The first is a pro rata scenario in which the money market income would be included in the numerator of the FASIT Rate, but the money market account principal is not included in the FASIT assets in the denominator. The second is a principal scenario in which the money market income would be included in the numerator and the money market principal income would be included in the denominator. The third is a gain scenario in which the money market income would be treated as gain entirely allocable to the Class I Note and would be excluded from the FASIT Rate computation.

Petitioner used an approach similar to the pro rata scenario. Because the money market account principal was not included in the denominator of the computation of the FASIT Rate, the FASIT Rate Interest increased and Additional Interest was reduced by the same amount. Mr. Ahmad explained that the pro rata approach resulted in an excess allocation to the Series A/E Stockholder and the Class II Noteholder.

Both the principal scenario and the gain scenario are similar to the terms of the 2000 and 2003 AMAs. The principal scenario follows the FASIT Rate in the AMAs because the money market interest is included in earned income of the FASIT and money market principal is included in the FASIT assets. The gain scenario follows the AMAs because gain allocated to the FASIT assets should be allocated to the Class I Noteholder.

Petitioner's use of a pro rata approach resulted in the Series A/E Stock's receiving more of the earnings from the money market account. This allocation of FASIT income deviated from the transaction documents, resulting in the Series A/E Stock's receiving more interest than the weighted average. Since the Series A/E Stock did not receive dividends based on a weighted average, the Series A/E Stockholder did not hold a qualified regular interest, resulting in the FASIT arrangement's being invalid. *See* § 860L(b)(1)(A)(ii); Treas. Reg. § 1.860G-1(a)(3)(ii)(B).

2. *Effect of Chase's Withdrawal on the Series A/E Stock's Status as a Regular Interest*

Following Chase's withdrawal from the FASIT and repayment of the Class II Note in 2003, petitioner and Dynamo executed the 2003 AMA to reflect Chase's withdrawal. The principal amount of Dynamo's Class I Note was reduced from $500,000 to $100,000. The terms governing the allocation of FASIT income, including the calculation of FASIT Rate Interest, Supplemental Interest, and Additional Interest were left unchanged. Dynamo did not file a new or updated FASIT election reflecting the revised structure of the FASIT. Dynamo continued claiming an expense for "Interest on Senior FASIT Regular Interest," but in a lower amount than in prior years.

Respondent argues that the failure to update, and the consequent deviation from the terms of the governing documents, caused the Series A/E Stockholder to accrue interest payments or other similar amounts at a rate higher than a permitted variable rate. Petitioner contends that the failure to update the basis point adjustment component of the Additional Interest formula was a scrivener's error. It further contends that the Series A/E Stockholder was still paid on the basis of a weighted average rate, and that any deviation was a permissible modification to a weighted average rate under the regulations.

Respondent's expert Mr. Ahmad described petitioner's position regarding its basis point adjustment from 0.0003291153 to 0.000002774 to ensure that the Additional Interest would always be zero as "modification by conduct." This change to the basis point component of the Additional Interest formula was not made in writing. Before Chase withdrew and Dynamo reduced its exposure, Additional Interest would calculate to zero as long as total Supplemental Interest was $186,264. When the total Supplemental Interest due to the parties decreased to $1,552, the remaining $184,712 was Additional Interest owed to Dynamo according to the formula in the Class I Note.

Petitioner made distributions as if the Additional Interest provision had been updated. Mr. Ahmad explained the effects of petitioner's allocation of income from the underlying assets to Dynamo and the Series A/E Stockholder. The income was allocated as if the Additional Interest formula had been updated. When calculating the Additional Interest rate with a basis modification of 0.000002774, the remaining $184,712 surplus that flowed yearly to the Series A/E

Stockholder should instead have been paid to the holder of the Class I Note.

The increase in return to the Series A/E Stockholder was not a permitted modification to a weighted average rate and resulted in dividends being paid on the Series A/E Stock that were not based on a weighted average rate. Thus, even if the Series A/E Stock had previously been a valid regular interest, it would have ceased to be one upon the withdrawal of Chase from the arrangement in 2003.

3. *Changes to the FASIT Arrangement Before January 1, 2005*

The grandfather provisions of the FASIT regime provide that the repeal of the FASIT rules does not apply to a FASIT in existence on October 22, 2004, if the regular interests issued by the FASIT remain outstanding in accordance with the original terms of issuance. AJCA § 835(c)(2). Under the 2000 and 2003 AMAs, the FASIT would terminate on January 15, 2005, and the Class I and II Notes and the Series A/E Stock would be redeemed on the same day. The AMAs included a provision for a five-year extension of the FASIT and a provision requiring written notice of extension of the FASIT. The notice of extension was due by October 15, 2004.

The parties did not provide notice of their decision to extend the FASIT by October 15, 2004. On January 14, 2005, the parties agreed to extend the FASIT for five years and to waive the 90-day renewal requirement. The modification to waive the 90-day renewal notice resulted in a modification of the regular interests issued before October 22, 2004, because the regular interests were no longer outstanding in accordance with their original terms.

Petitioner contends that the FASIT arrangement met the requirements of the grandfather clause. The AMAs provided that the FASIT could be extended only in writing. The waiver of the 90-day renewal notice was not in accordance with the AMA. Since the requirements of the AMA were not met, the Series A/E Stock did not meet the regular interest requirement. The waiver and extension of the FASIT has no legal effect because the FASIT terminated by its own terms.

Additionally, petitioner argues that prior deviations from the contract previously discussed do not violate the grandfather clause requirement that the regular interests continue to remain outstanding

in accordance with their original terms and that the redemption of the Class II Note did not cause the arrangement to fail to meet the grandfather clause requirements. We disagree.

The Series A/E Stock received Additional Interest from the money market income that was not computed as provided for in the AMA and the formula in the Class I Note. After September 30, 2003, the Series A/E Stock received amounts that originally were to be paid to the Class I and Class II Noteholders as Supplemental Interest because the formulas relating to Supplemental Interest did not take into account the termination of the Class II Note upon Chase's withdrawal from the FASIT and the reduction in principal of the Class I Note from $500,000 to $100,000. In both of these instances, which are discussed in more detail *supra* Opinion Part II.B.2, there was a modification of regular interests.

These modifications result in a failure to meet the requirement of the grandfather clause because the regular interests did not remain outstanding with the original terms of issuance. The original terms of the AMA, the Class I Note, and the Class II Note were modified.

4. *Conclusion*

We conclude that even if the FASIT arrangement was valid from its inception, it ceased to be a valid FASIT at two other points: (1) in the latter half of 2000 because of the allocation of income earned by the money market account and (2) in the latter half of 2003 because of Chase's withdrawal from the arrangement. Additionally, petitioner has failed to meet the requirements of the grandfather clause.

III. *Petitioner's Substantial Compliance Argument*

Petitioner argues alternatively that if the Court agrees with respondent that the FASIT arrangement did not comply with all of the FASIT rules, the arrangement should still be treated as a FASIT because petitioner substantially complied with the FASIT rules and "any minor 'errors' do not deprive the FASIT arrangement of its FASIT status." As discussed *supra* Opinion Part II.A, we conclude that the FASIT arrangement was not a valid arrangement from its inception.

Petitioner argues that it took all reasonable steps to, and intended to, comply with the FASIT statutory requirements and the accompanying regulations. Respondent argues that the substantial compliance doctrine does not apply and that it is a "narrow equitable

doctrine." *See Samueli v. Commissioner*, 132 T.C. 336, 345 (2009). Respondent does not dispute that petitioner intended to enter into a FASIT in 2000.

When there is a failure to comply with the essential requirements of the governing statute, no defense of substantial compliance is available. *Estate of Clause v. Commissioner*, 122 T.C. 115, 122 (2004). When requirements relate "to the substance or essence of the statute," we require "strict adherence to all statutory and regulatory requirements." *Bond v. Commissioner*, 100 T.C. 32, 41 (1993) (quoting *Taylor v. Commissioner*, 67 T.C. 1071, 1077 (1977)). On the other hand, if requirements are "procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict compliance." *Id.* (quoting *Taylor*, 67 T.C. at 1077–78).

In this case statutory requirements must be met for there to be a valid FASIT arrangement. We have held that if a taxpayer wished to take advantage of subchapter S provisions, the taxpayer must comply with all of the statutorily mandated requirements. *Combs v. Commissioner*, T.C. Memo. 1989-206, 57 T.C.M. (CCH) 288, 290, *aff'd*, 907 F.2d 151 (6th Cir. 1990) (unpublished table decision); *see also Brutsche v. Commissioner*, 585 F.2d 436, 439 (10th Cir. 1978), *vacating and remanding* 65 T.C. 1034 (1976).

In *Dirks v. Commissioner*, T.C. Memo. 2004-138, 87 T.C.M. (CCH) 1403, 1405, *aff'd*, 154 F. App'x 614 (9th Cir. 2005), the Court declined to apply the substantial compliance doctrine to the statutory 60-day deadline applicable to individual retirement account rollovers under section 408(d)(3)(A) because "the 60-day rule is not regulatory but is found in the statute itself." As in *Dirks*, the Court is asked whether the substantial compliance doctrine applies to a Code section.

Respondent's adjustments in the Notice of Deficiency are primarily based on Code sections. The statute creating FASITs provided five requirements for an entity to be treated as a FASIT, and these requirements are in the conjunctive. *See* § 860L(a). Additionally, Congress placed limits on the yields that regular interests in a FASIT could provide to their holders and required unconditional and pre-specified interest payments and return of principal. *See* § 860L(b)(1)(A). The FASIT arrangement at issue was not a valid FASIT from its inception because the Series A/E Stock did not meet the requirements of regular interest as discussed *supra* Opinion Part II.A. The statute is

clear that all the requirements need to be met in order for an arrangement to be treated as a FASIT. Accordingly, the substantial compliance doctrine does not apply.

Petitioner has failed to show that the arrangement among it, SAAN, Dynamo, and Chase was a valid FASIT from its inception, before 2003, and on October 22, 2004, when the FASIT repeal became effective. Specifically, the Series A/E Stock was not a valid regular interest under section 860L(a)(1)(B). Additionally, substantial compliance does not apply to section 860L(b)(1).

IV. *Beneficial Ownership*

In the alternative, petitioner contends that it should not be required to recognize or pay tax on the income from the FASIT assets because it was not the beneficial owner of those assets. Petitioner argues that the FASIT investors are the beneficial owners of those assets.

The facts are inconsistent with petitioner's argument. Petitioner had legal title to the intercompany receivables set forth in the election. Petitioner did not use the funds received from the issuance of the Class I Note, the Class II Note, and the Series A/E Stock to acquire the underlying intercompany receivables because it was already the legal owner of the assets.

As asset manager, petitioner could replace the assets with permitted assets without the consent of the investors. Only petitioner, and not the investors, had legal recourse if debtors failed to make payment on the intercompany receivables. The investors had only contractual rights to amounts based on the proceeds from the intercompany receivables.

Respondent contends that if the FASIT rules do not apply, the assets held in the structure are corporate assets. Courts have applied the following factors to determine the ownership of securities: (1) the risk of investment loss, (2) the opportunity for investment gain, (3) the ability to select and control the securities for investment, and (4) the right to exercise other prerogatives of ownership. *GWA, LLC v. Commissioner*, T.C. Memo. 2025-34, at *71. After application of the factors we conclude that petitioner was the beneficial owner.

The risk of loss factor likely favors petitioner as beneficial owner because Dynamo and Chase had no risks in relation to the underlying

assets and were limited to the recourse provided in the Class I Note and the Class II Note. The opportunity for gain factor is neutral since both petitioner and the investors had the opportunity for investment gain.

The third and fourth factors favor petitioner as the beneficial owner. Petitioner, not the investors, was a party to the intercompany receivables and had the right to sell or dispose of, change, or modify the intercompany receivables consistent with the terms of the arrangement.

Additionally, petitioner relies upon *Geftman v. Commissioner*, 154 F.3d 61 (3d Cir. 1998), *rev'g in part* T.C. Memo. 1996-447. In *Geftman*, the U.S. Court of Appeals for the Third Circuit, to which this case is appealable absent a stipulation to the contrary, concluded that corporations were the beneficial owners of certain mortgages by relying upon two factors: (1) control over the property and (2) the right to economic benefits. *Id.* The Third Circuit looked to who had actual control over the mortgages and their benefits. In this case, petitioner had control over the assets. Both petitioner and the investors had economic benefits in the intercompany receivables, but only petitioner held title, possession, and control over the intercompany receivables. Petitioner also could sell or exchange the intercompany receivables.

Petitioner contends that the FASIT arrangement was designed as a passthrough structure and that the yearly proceeds from the FASIT assets went to pay returns to the Class I and Class II Noteholders and any residual profits went to the Series A/E Stockholder. Petitioner has not provided a legal or factual basis to support its argument that the FASIT arrangement was a passthrough. From the record of this case, petitioner has failed to show that it was not the beneficial owner of the assets.[14]

## V. *Whether the Series A/E Stock Was in Substance Debt or Equity*

Upon cessation of a qualified FASIT, regular interest holders are treated as exchanging their regular interests for interests in the

---

[14] Petitioner did not raise the beneficial ownership argument until the filing of its Pretrial Memoranda. Respondent contends that he would be prejudiced if we were to consider petitioner's beneficial ownership argument. We tend to agree; however, we are able to decide this issue on the evidence before us. *See Smalley v. Commissioner*, 116 T.C. 450, 456 (2001); *see also Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981) (stating that whether a taxpayer experiences the benefits and burdens of ownership of an asset is a question of fact which must be ascertained from the intent of the parties as evidenced by their written agreements).

underlying arrangement. Prop. Treas. Reg. § 1.860H-3(c)(2) and (3), 65 Fed. Reg. 5807, 5821–22 (Feb. 7, 2000). Interests in the underlying arrangement are classified as debt or equity under general principles of federal tax law. *Id.* If a valid FASIT never existed or ceased to exist, the segregated pool of assets would be considered assets of the owner. *Id.* para. (c)(1), 65 Fed. Reg. at 5821.

In this case petitioner would be the actual owner of the FASIT assets. The underlying contracts would remain in effect. The interest payments made to Dynamo would be deductible as interest expenses. The payments made to the Series A/E Stockholders would be dividends paid on equity and would not be deductible for U.S. tax purposes. As a result of our conclusion that the FASIT was invalid, petitioner's taxable income should increase by an amount equal to the earnings on the FASIT assets less the interest paid to Dynamo, petitioner's asset management fee, and any other expenses of the FASIT.

Petitioner contends, as an alternative argument, that the Series A/E Stock is debt in substance and that the "dividend payments" on the Series A/E Stock are in substance deductible interest. Respondent contends that the Series A/E Stock should be treated as equity and not debt. We agree with respondent.

In resolving questions of debt versus equity, courts have identified and considered various factors. *Calumet Indus., Inc. v. Commissioner*, 95 T.C. 257, 285 (1990); *see also Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476, 493 (1980). Petitioner has the burden of showing that Series A/E Stock is debt. *See Dixie Dairies Corp.*, 74 T.C. at 493.

The Third Circuit, has identified sixteen factors to consider in this analysis. *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968). The *Fin Hay* factors are:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the

> instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.*

In *Scriptomatic, Inc. v. United States*, 555 F.2d 364, 367–68 (3d Cir. 1977), the Third Circuit identified the ultimate issue under *Fin Hay* as whether the transaction, when measured by objective standards, "would have taken the same form had it been between the corporation and an outside lender." "It is only within this framework that the many factors listed in *Fin Hay* and in other court decisions in this area have any meaning or function." *Id.* at 368.

No single factor is determinative, and not all factors are applicable in each case. *Dixie Dairies Corp.*, 74 T.C. at 493. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." *Id.* at 494 (quoting *Estate of Mixon v. United States*, 464 F.2d 394, 403 (5th Cir. 1972)). In our analysis we address the most relevant factors.

A. *Intent of the Parties*

We analyze the objective facts to determine whether the parties had a reasonable expectation of repayment, whether their intentions comported with the economic reality of the debtor-creditor relationship, and how they treated the relevant documents. *See Lane v. United States* (*In Re Lane*), 742 F.2d 1311, 1316–17 (11th Cir 1984); *see also Geftman v. Commissioner*, 154 F.3d at 68. Transactions between related parties are "subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt." *Geftman v. Commissioner*, 154 F.3d at 68 (quoting *United States v. Uneco, Inc.* (*In re Uneco, Inc.*), 532 F.2d 1204, 1207 (8th Cir. 1976)).

Petitioner contends that the parties intended the Series A/E Stock to be debt because regular interests in a FASIT are statutorily treated as debt. It further contends that the transaction was structured so that the Series A/E Stockholder would receive yearly a predictable share of

income from the FASIT assets and a return of its invested capital at the end of the transaction. Respondent's position is that petitioner's intent to implement a FASIT is immaterial, and that the attributes of the Series A/E Stock itself are those of equity and, accordingly, the payments on the Series A/E Stock would not have been deductible as interest payments.

Without the statutory exception, the parties to the FASIT intended the Series A/E Stock to be equity. Petitioner labeled the Series A/E Stock, and referred to it, as stock in employee emails, transaction documents, and petitioner's approval presentation. Even as far back as Babcock & Brown's promotional materials, SAAN's interest was characterized as stock.

The objective features of the Series A/E Stock further indicate that, but for its being issued as part of the FASIT, the parties intended the Series A/E Stock to represent equity. The Stock Certificate pertaining to the Series A/E Stock relevantly provided its holder the following rights and restrictions: (1) authorization of petitioner's board of directors to declare dividends on the Series A/E Stock, (2) provision of corporate management rights, including the ability to vote for one of petitioner's directors, and (3) allocation of no rights typically afforded corporate creditors.

Additionally, petitioner treated the Series A/E Stock as equity for accounting purposes. The principal motivation to create a FASIT was to allow dividend payments on the Series A/E Stock to be treated as deductible interest payments. Petitioner intended that the French taxing authority treat the Series A/E Stock as equity. Its own document explaining the arrangement indicates that "so-called regular interests are deductible regardless of the actual form of such interest." Because petitioner, aside from its intention to create a valid FASIT, treated the Series A/E Stock as equity, this factor favors the conclusion that the Series A/E Stock was equity.

B. *SAAN's Identity of Interests as Creditor and Stockholder*

SAAN purchased the Series A/E Stock from an entity with which it shared a common parent. The Series A/E Stock was part of a tax arbitrage transaction, the benefits of which would accrue to the multinational group as a whole. As a result, the interests of all parties to the FASIT were not aligned with enforcing the rights afforded to them by the instruments they held, but rather to keep the FASIT intact.

SAAN advanced approximately 98% of the funding of the FASIT in exchange for the Series A/E Stock and expected, with minor adjustments, pro rata returns. This indicates that SAAN's advance was made in exchange for an equity interest. Because of the allocation of economic interests in the FASIT with respect to the Series A/E Stock and the interrelatedness of the parties, this factor favors the conclusion that the Series A/E Stock was equity.

C. *Voting Rights and Participation in Management of Petitioner*

An increase of management rights resulting from an advance generally indicates equity characterization. *NA Gen. P'ship & Subs. v. Commissioner*, T.C. Memo. 2012-172, slip op. at 22. SAAN, as the Series A/E Stockholder, was entitled to one vote per share on all corporate matters and voted with the holders of petitioner's common stock. Further, SAAN was entitled to elect one member of petitioner's board of directors. This factor favors the conclusion that the Series A/E Stock was equity.

D. *Whether Petitioner Could Have Obtained Third-Party Lending*

"Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." *Fin Hay*, 398 F.2d at 697. A taxpayer's ability to secure financing under similar terms from a third party is relevant in measuring the economic realities of a transaction. *Scriptomatic*, 555 F.2d at 367; *see also NA Gen. P'ship & Subs.*, T.C. Memo. 2012-172, slip op. at 35. In other words, we inquire whether an outside investor would have advanced funds on terms similar to those agreed to by the shareholder. *Scriptomatic*, 555 F.2d at 368.

Petitioner argues that Chase's minor investment in the arrangement from 2001 to 2003 indicates that the FASIT was an attractive investment to third parties. Respondent disputes this argument.

Respondent's expert Mr. Ahmad explained that the Series A/E Stock would not have been marketable to an unrelated third party under its terms for several reasons. Because of the additional risk posed by its subordinated position in the FASIT's capital structure, outside investors

would demand a higher return on the Series A/E Stock than the returns on the Class I and II Notes and the underlying pool of assets.

According to Mr. Ahmad's testimony, the Series A/E Stock received the residual income from the FASIT assets, which was equal to LIBOR plus 0.17% at the outset of the transaction.[15] This is a lower rate of return than LIBOR plus 0.205%, which the initial pool of the underlying FASIT assets offered. The Series A/E Stock's return is also lower than the expected return, LIBOR plus 1.75%, of the Class I Note and the Class II Note. Mr. Ahmad concluded that as a result of its lower rate of return, and because there were publicly available investment grade debt securities that offered higher returns for similar risk at the time the parties formed the arrangement, a third party investor would not have invested in the Series A/E Stock. We find that this factor favors the conclusion that the Series A/E Stock was equity.

E. *The Risk Involved*

An investor's degree of risk and whether their advance to a corporation is speculative are key factors in determining the economic realities of a transaction. *Scriptomatic*, 555 F.2d at 367. Petitioner argues that the lack of upside potential favors a conclusion that the Series A/E Stock should be treated as debt.

Respondent's experts Messrs. Ahmad and Cohen explained that SAAN was exposed to numerous financial risks. These include the lack of constraint on the credit worthiness of the FASIT assets, the illiquidity of the investment, the lack of remedies or recourse if petitioner violated terms of the Series A/E Stock, the lack of priority to or protection of the FASIT assets against third-party creditors, the Series A/E Stock's position in the FASIT's capital structure, and the uncertainty regarding the amount of the liquidation preference the holder was entitled to at redemption or liquidation. In conjunction these risks made investing in the Series A/E Stock riskier than traditional debt instruments and favor the conclusion that the payment for the stock was an equity advance.

[15] At the outset the underlying pool of FASIT assets accrued interest at a rate of LIBOR plus 0.205%, 0.005% of which funded the asset manager's fee. Considering the supplemental interest adjustment that equated to approximately 0.033% of the principal amount of the Series A/E Stock, the rate of interest paid to the Series A/E Stock was approximately LIBOR plus 0.17%.

F. *Existence of and Labels Given to a Debt Instrument*

The issuance of a debt instrument such as a promissory note, bond, or debenture indicates debt, and the issuance of an equity instrument such as a stock certificate supports equity characterization. *Anchor Nat'l Life Ins. Co. v. Commissioner*, 93 T.C. 382, 404–05 (1989). Regardless of form, a taxpayer is not relieved of its obligation to show that it entered into a debt arrangement, and valid debt may exist between parties even where no formal debt instrument exists. *Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377–78 (1973).

Babcock & Brown's promotional materials and petitioner's approval presentation characterized SAAN's interest as stock or preferred stock. Petitioner contends that even though the Series A/E Stock was formally denominated stock of a corporation, it was created, labeled, and treated like a regular interest in a FASIT, which by statute is treated as debt. The Series A/E Stock would be treated as a regular interest only if the statutory requirements of a FASIT were met. Without the FASIT rules the Series A/E Stock would have been treated as equity. This factor favors the conclusion that the Series A/E Stock was equity.

G. *The Relative Position of the Series A/E Stock in the FASIT's Capital Structure*

Whether a purported creditor's rights to receive interest and principal payments are subordinated to other creditors' is a factor in whether the funds should be treated as equity. *Estate of Mixon*, 464 F.2d at 406. As discussed *supra* Opinion Part II.A.2, the Series A/E Stock featured no guaranty that any specified amount would be repaid as interest or principal. Petitioner structured the terms of the Series A/E Stock such that it received the residual income and residual principal upon liquidation from the FASIT assets. An interest entitled to the residuary of a corporation's earnings and assets is inherently subordinated to the other creditors and/or shareholders of that corporation.

The 2000 and 2003 AMAs provided that payments due on the Class I Note, the Class II Note, and the Series A/E Stock were to be made only from the revenue generated by the FASIT assets. Additionally, the Class I Note and the Class II Note and the Series A/E Stock were to remain outstanding if the arrangement was never, or ceased to be, a

FASIT. In such a case, the Series A/E Stock would have been in the most subordinated position in petitioner's capital structure.

Petitioner's failure to show that the FASIT assets were protected from its general creditors in the case of bankruptcy indicates that the Series A/E Stock was subordinated to the general creditors and other common shareholders of petitioner. Petitioner's expert Dr. Cragg testified that the Class I Note's having priority over the Series A/E Stock did not indicate that the instrument was equity because corporate borrowers issue different tiers of debt.

Respondent's expert Mr. Ahmad countered in his rebuttal report that the Series A/E Stock was in the most subordinated position in the transaction. He explained that the junior-most tranche in a securitization is considered equity because it receives residual cashflows. Its returns depend on the performance of the securitized assets just as equity holders in a company rely on the performance of the underlying business for their returns. We agree. This factor favors the conclusion that the Series A/E Stock was equity.

H. *Fixed Rate of Interest*

Predictable and consistent interest payments, such as those determined with reference to a fixed rate or variable rate with reference to a benchmark rate, suggest a debtor-creditor relationship. *Fin Hay*, 398 F.2d at 696. Generally, periodic payments that vary in amount and correlate with the undistributed profits of a business are considered dividends on equity. *See Himmel v. Commissioner*, 338 F.2d 815, 817 (2d Cir. 1964), *rev'g* 41 T.C. 62 (1963).

The payments owed to SAAN as the Series A/E Stockholder were subject to the discretion of petitioner's board of directors and were defined as the FASIT's earnings less the payments owed on the Class I Note, the Class II Note, and the FASIT's expenses, effectively a residual amount. Petitioner has not shown that the Series A/E Stock would receive a fixed rate of interest. This factor favors the conclusion that the Series A/E Stock was equity.

I. *Contingency on the Obligation to Repay*

Whether an advance of funds featured objective, economic factors that suggest the lender took the customary steps, such as obtaining a security interest in assets of the obligor, to ensure repayment helps

determine whether the advance gave rise to debt or equity. *Geftman v. Commissioner*, 154 F.3d at 71–72.

With respect to both dividend payments and repayment of the Series A/E Stock's original issue price, SAAN was entitled to an amount determined by the income, and FMV, of the FASIT assets. The timing and amount of payment of such dividends were at the discretion of petitioner's board of directors. As discussed *supra* Findings of Fact Part II.B, the residual interest in the cashflow of the FASIT and the liquidation preference that the Series A/E Stockholder was entitled to did not guarantee a return of the stock's original issue price. SAAN had no mechanism to enforce payment of dividends or to require repayment of the full original issue price of the Series A/E Stock.

Further, SAAN's right to a liquidation preference was not secured by any assets of petitioner beyond the Series A/E Stock's rights to the residual cashflows of the FASIT assets and the liquidation preference. The FASIT's having a security interest in the receivables of API did not serve as protection for SAAN's interest specifically, which was limited to the liquidation preference of the FASIT, but to the FASIT arrangement as a whole. The security interest mitigated the credit risk the FASIT was exposed to by holding the 2003 and 2005 Loans, but it did not guarantee anything to SAAN as the Series A/E Stockholder. These residual interests did not guarantee the Series A/E Stock dividends at a predictable rate or unconditionally entitle SAAN to return of the entire original issue price. This factor favors the conclusion that the Series A/E Stock was equity.

J. *Source of Interest Payments*

If interest payments on an advance are funded by corporate earnings, the advance looks like an equity contribution. *Anchor Nat'l Life Ins. Co.*, 93 T.C. at 406. When repayment is not dependent upon earnings, the interest is more likely to be characterized as a loan. *Id.*

Under the 2000 and 2003 AMAs, dividends paid on the Series A/E Stock were funded by the undistributed profits of the FASIT only, and not from any of petitioner's other assets. Further, petitioner failed to follow the terms of the AMAs throughout the term of the arrangement by paying to the Series A/E Stockholder additional profits earned as interest from a money market account and after Chase's withdrawal from the arrangement. Since the source of the dividends was restricted to the FASIT's earnings, and the amounts of the dividends fluctuated

with the income the FASIT earned and the amount of FASIT assets it held, this factor favors the conclusion that the Series A/E Stock was equity.

K. *Timing of Advance with Reference to the Organization of the Corporation*

If a corporation uses an advance of funds to acquire its initial assets, or the advance represents a long-term commitment dependent on the future value of the corporation's assets, the advance looks more like an equity advance. *See S.P. Realty Co. v. Commissioner*, T.C. Memo. 1968-156, 27 T.C.M. (CCH) 764 (citing *Fin Hay*, 398 F.2d 694); *see also Estate of Mixon*, 464 F.2d at 410–11. Petitioner argues that because the Series A/E Stock was issued long after petitioner's formation, this factor does not favor equity.

The Series A/E Stock had an interest in the FASIT arrangement and not in all the assets of the corporation. The payments to the Series A/E Stockholder depended on the success of the FASIT arrangement. The Series A/E Stock represents an equity interest in the segregated pool of assets. Accordingly, this factor weighs in favor of equity.

L. *Debt Versus Equity Conclusion*

Our review of the terms of the Series A/E Stock in the light of the *Fin Hay* factors resulted in 11 factors favoring equity. Additionally, the intent of the parties to the arrangement clearly favors the conclusion that the Series A/E Stock was equity. Accordingly, the Series A/E Stock should not be treated as a debt instrument.

VI. *Conclusion*

Petitioner has not established that the arrangement among itself, SAAN, and Dynamo was a valid FASIT for the years in issue. Additionally, the substantial compliance doctrine does not apply to section 860L(b)(1), and petitioner did not show that it was not the beneficial owner of the FASIT assets. Petitioner must recognize the interest income generated by the FASIT assets. We further conclude that the Series A/E Stock was in substance equity, and petitioner may not deduct amounts paid as dividends to SAAN as deductible interest payments.

We have considered the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I electronically filed the Joint Appendix, Volume 1 of 2 (JA1-JA50), with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Parker Rider-Longmaid*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116
Telephone: 617-573-4807
parker.rider-longmaid@skadden.com

*Counsel for Petitioner-Appellant Aventis, Inc., and Subsidiaries*